**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 04-1934

MICHAEL WHITE,

Plaintiff - Appellant,

versus

JAMES STEVEN WRIGHT,

Defendant - Appellee.

Appeal from the United States District Court for the District of
Maryland, at Greenbelt.   Alexander Williams, Jr., District Judge.
(CA-02-3522-AW)

Argued:  May 26, 2005                Decided:  September 23, 2005

Before TRAXLER and DUNCAN, Circuit Judges, and Eugene E. SILER,
Jr., Senior Circuit Judge of the United States Court of Appeals for
the Sixth Circuit, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Joseph John D'Erasmo, Rockville, Maryland; Martha L.
Handman, Gaithersburg, Maryland, for Appellant.  Roann Nichols,
Assistant United States Attorney, OFFICE OF THE UNITED STATES
ATTORNEY, Baltimore, Maryland, for Appellee.  **ON BRIEF:** Thomas M.
DiBiagio, United States Attorney, Baltimore, Maryland, for
Appellee.

Unpublished opinions are not binding precedent in this circuit.
See Local Rule 36(c).

PER CURIAM:

Michael White appeals the dismissal of his civil rights action against Lieutenant James Steven Wright ("Lt. Wright") stemming from the investigation, indictment, prosecution, and ultimate acquittal of White on mail fraud charges. For the reasons set forth below, we affirm.

I.

White, formerly employed as a Maryland State Trooper, conducted vehicle salvage inspections for automobile dealers in Prince George's County, Maryland, from 1992 to 1995. White performed a number of vehicle inspections for Clinton Auto Sales ("Clinton Auto"), a used car dealership owned by Basem Najjar. A portion of the vehicles sold by Clinton Auto were "salvage" vehicles Najjar purchased at auctions to rebuild and sell. Under Maryland law, salvage vehicles include automobiles that have been damaged to the point that repair costs exceed fair market value of the automobile, automobiles that have been obtained by an insurance company as part of a claim settlement, and automobiles acquired for rebuilding or for parts. See Md. Code, Transportation, § 11-152(a). Also included are stolen vehicles that have been recovered by an insurance company. See Md. Code, Transportation, § 13-507(c)(1).

2

Maryland law requires anyone who acquires ownership of a salvage vehicle to apply for a salvage certificate from the Maryland Motor Vehicle Administration ("MVA"). See Md. Code, Transportation, § 13-506. Before the holder of a salvage certificate may apply for a certificate of title, he must obtain a "certificate of inspection issued by a county police department." Md. Code, Transportation, § 13-507(a)(2). The MVA may not issue a certificate of title if the salvage certificate does not bear a signature indicating the completion of an "inspection by a police officer in [Maryland] who is authorized to inspect salvage vehicles." Code of Md. Regs. 11.15.14.04.

After performing the inspection, the officer signs the salvage certificate under the following printed block:

**CERTIFICATION OF INSPECTION BY POLICE AGENCY**

> I, THE UNDERSIGNED AUTHORIZED REPRESENTATIVE OF THE POLICE AGENCY NAMED BELOW, HEREBY STATE THAT I HAVE INSPECTED THE VEHICLE DESCRIBED ABOVE AND VERIFIED THE VEHICLE IDENTIFICATION NUMBER.

J.A. 158.

Najjar's operation of Clinton Auto came under investigation and eventually led to his indictment and conviction on federal mail fraud, possession, transportation, and money laundering charges. See United States v. Najjar, 300 F.3d 466 (4th Cir. 2002). We described his scheme as follows:

> [Najjar's] mode of business was to steal expensive, late model cars . . . and strip them of parts. The cars would then be abandoned for the police to find. The insurance

3

companies holding the policies on the cars would declare them total losses, and sell the recovered vehicles for salvage. Najjar and his agents would then buy the salvaged cars at insurance auctions and use them for reassembly . . . [S]ometimes stolen parts were used on the very same cars from which they were stolen. Najjar and his cohorts would sell the reassembled cars at . . . Clinton Auto Sales.

Id. at 471.

After learning that White was doing salvage inspections at Clinton Auto, Lt. Wright, then head of the Maryland State Police ("MSP") auto theft unit, opened an internal investigation file on White. Lt. Wright eventually took the case to federal prosecutors, for whom he continued to serve as a primary investigator, having been specially deputized as a federal agent.

White was indicted by a federal grand jury as a participant in Najjar's scheme. The government alleged in the indictment that White performed the inspections Najjar needed in violation of internal MSP rules for conducting salvage inspection. According to the government, White signed off on vehicles that were rebuilt with stolen parts or were not adequately restored or "road worthy" as required by MSP rules, conducted inspections at improper times and places, and concealed his activity by failing to follow standard procedures for disclosing information about the inspections.

White voluntarily turned himself in after the indictment was returned. He had his picture taken, was fingerprinted, and then was released subject to conditions in a bond. Prior to White's

trial, MSP suspended his police powers. Ultimately, White was acquitted by a jury on all charges.

White thereafter initiated this action against Lt. Wright. In his amended complaint[*], White alleged that Lt. Wright deliberately presented false information to and concealed exculpatory information from prosecutors and the grand jury regarding White's involvement with Najjar and Clinton Auto, and that prosecutors and the grand jury relied on Lt. Wright's investigation in indicting and prosecuting White. Additionally, White alleged that MSP authorities suspended him as a result of the indictment and criminal proceedings brought about by Lt. Wright's investigation.

Of the false information that Lt. Wright is alleged to have intentionally provided prosecutors and MSP officials, White highlights the following as the most significant: (1) that salvage inspectors were required to examine salvage vehicles for stolen parts and that, by signing a salvage certificate, White was certifying that the vehicle had not been restored with stolen

---

[*]Earlier in the proceedings, the district court granted Lt. Wright's motion to dismiss White's original complaint but afforded White leave to amend his complaint to allege facts that would support cognizable claims. In so doing, the court noted that "a significant amount of the allegations involving investigation, prosecution and testimony appear to fall within the protection of absolute and qualified immunity." J.A. 15. The district court also noted "reservations whether much if any of the allegations . . . set forth in the Complaint make out a cognizable claim." J.A. 15. Nonetheless, the court afforded White the "opportunity to present his claims with greater details and particulars." J.A. 15.

5

parts; (2) that White was ordered in 1993 by his superiors to stop performing salvage inspections; (3) that White signed a salvage certificate for an unrestored Nissan 300ZX; (4) that White failed to comply with MSP salvage inspection procedures regarding off-duty inspections and the required location for inspections; (5) that White failed to file required salvage inspection incident reports in order to conceal his work for Clinton Auto; and (6) that White signed off on salvage vehicles that were unrestored. White also alleged that Lt. Wright concealed from prosecutors and MSP officials the fact that White first approached Lt. Wright, and not the other way around, about the possibility that Najjar might be engaged in illegal activity. White asserts that Lt. Wright purposely destroyed an audio taped interview during which Lt. Wright acknowledged that fact.

Based on the foregoing allegations, White contended that Lt. Wright violated his Fourth Amendment rights by "caus[ing], institut[ing], and continu[ing] a criminal proceeding against [White] without probable cause" and by causing White to be seized and detained without probable cause. J.A. 46. Second, White argues that his Fifth Amendment right "not to be deprived of his liberty or property without due process" was violated by Lt. Wright's conduct. To the extent that Lt. Wright was acting as a federal agent when he engaged in this alleged conduct, White asserted these claims under Bivens v. Six Unknown Named Agents of

6

the Federal Bureau of Narcotics, 403 U.S. 388 (1971). To the extent Lt. Wright was acting under state law, White asserted the claims under 42 U.S.C.A. § 1983 (West 2003).

Lt. Wright moved to dismiss the complaint or, alternatively, for summary judgment, contending that White failed to state a constitutional claim against him and that he was protected by qualified immunity. After oral argument, the district court ruled from the bench, granting the defendant's motion to dismiss or for summary judgment in the alternative. The district court observed that

> [nothing in the record] suggest[s] that what [Lt. Wright] was doing was deliberate . . . [I]n the absence of any warrant [or] any arrest in this case, and the grand jury having acted – having found probable cause . . . I think there is no seizure. [As for White] being papered and fingerprinted and somewhat restricted for hours or whatever, that's, at best, de minimis injury . . . .
>
> . . . [H]e was never picked up but he turned himself in once . . . the grand jury handed down that indictment, . . . I don't believe there is a Fourth Amendment violation.
>
> The Fifth Amendment [claim] . . . is very . . . vague. We don't know whether he's claiming procedural or substantive. . . [W]here there's been a finding by the grand jury that there was . . . probable cause . . . [there is no] Fifth Amendment violation.

J.A. 146-48.

The district court then indicated that it was dismissing the complaint under a Rule 12(b)(6) standard, but, alternatively, stated that there was a basis to grant summary judgment as well. It appears that the district was applying its ruling to the first

7

step in the qualified immunity analysis -- a determination of whether a constitutional violation had been alleged. White appeals.

## II.

Our evaluation of Lt. Wright's qualified immunity claim involves a two-step process. The first step requires us to decide whether Lt. Wright's alleged conduct violated a constitutional right; if so, then the second step requires a determination of whether the constitutional right was clearly established at the time of Lt. Wright's actions. See Saucier v. Katz, 533 U.S. 194, 201 (2001).

We need only go as far as the first step in considering White's Fourth Amendment claim. In the amended complaint, White alleges that Lt. Wright violated his rights under the Fourth Amendment by "caus[ing], initiat[ing], and continu[ing] a criminal proceeding against [White] without probable cause." J.A. 46. As an initial matter, to the extent White contends that Lt. Wright violated the Fourth Amendment by continuing White's prosecution in the absence of probable cause, or by failing to attempt to terminate the proceedings, this claim fails. In Brooks v. City of Winston-Salem, 85 F.3d 178, 184 (4th Cir. 1996), we rejected a Fourth Amendment claim that an officer is subject to liability for not attempting to have a criminal proceeding halted when the officer knows the accused is innocent. As we observed, "the Fourth

8

Amendment provides all of the pretrial process that is constitutionally due to a criminal defendant in order to detain him prior to trial." Id.

The heart of White's Fourth Amendment claim, however, is that Lt. Wright intentionally submitted to prosecutors false evidence that, in turn, resulted in White's seizure. White argues that in the absence of Lt. Wright's fabricated information, there was no probable cause and, therefore, his seizure was unconstitutional.

The district court's primary basis for rejecting this claim appears to have been its conclusion that White was never technically seized. Although White was not forcibly taken into custody following the issuance of his indictment, he voluntarily surrendered to authorities and was detained briefly for fingerprinting and processing. White contends that this sequence satisfied the seizure requirement of the Fourth Amendment, and we agree. See Albright v. Oliver, 510 U.S. 266, 271 (1994) (noting that "surrender to the State's show of authority constituted a seizure for purposes of the Fourth Amendment"); see also Whiting v. Traylor, 85 F.3d 581, 585 n.6 (11th Cir. 1996) (explaining that a seizure occurs when the accused "subject[s] himself physically to the force of the state in response to an arrest warrant").

That White successfully alleges a seizure, however, does not end the matter. White cannot make out a Fourth Amendment claim unless he also demonstrates that Lt. Wright's wrongful acts resulted in

9

his being seized without probable cause. "It is well-established that a false or misleading statement in a warrant affidavit does not constitute a Fourth Amendment violation unless the statement is necessary to the finding of probable cause." Wilkes v. Young, 28 F.3d 1362, 1365 (4th Cir. 1994) (internal quotation marks omitted). Of course, in this case, the probable cause determination was made by the grand jury when it returned the indictment, rather than a magistrate issuing a warrant based upon an affidavit. See Kalina v. Fletcher, 522 U.S. 118, 129 (1997). White cites Lt. Wright's grand jury testimony, alleging that Lt. Wright deceived the grand jury and, by his false testimony, misled the grand jury into indicting White. Lt. Wright, however, is not subject to liability based on his testimony before the grand jury. See Lyles v. Sparks, 79 F.3d 372, 378 (4th Cir. 1996) (extending absolute immunity under Briscoe v. LaHue, 460 U.S. 325 (1983), to government witnesses in grand jury proceedings). Perhaps realizing that Lt. Wright enjoys immunity for his grand jury testimony, White's brief includes the categorical assertion that "Wright's non-testimonial acts caused White's seizure." Brief of Appellant at 46. He does not, however, support this statement with a citation to the record or any specific reference to supporting facts. In short, the record does not disclose, other than a few snippets of Lt. Wright's testimony, what information was presented to the grand jury with respect to the mail fraud charges against White. We are thus unable to

10

determine what exactly the grand jury considered in making its probable cause determination.

Accordingly, we affirm the district court's conclusion that White failed to establish a question of fact as to whether his Fourth Amendment rights were violated by Lt. Wright.

III.

Turning to White's due process claim under the Fifth and Fourteenth Amendments, we must first identify the particular right that White claims has been violated. To date, White's due process claim remains vague; indeed, the district court indicated that it was unable to ascertain whether White was asserting a substantive or procedural due process claim. White alleges in the complaint that Lt. Wright "purposely fabricat[ed] evidence [and] presented [it] to prosecutors and conceal[ed] or destroy[ed] exculpatory and impeaching evidence" which "deprived [White] of his liberty or property without due process of law." J.A. 47. White contends that Lt. Wright's fabrication and concealment of evidence resulted in a liberty deprivation--the suspension of White's police powers by the MSP--and a property deprivation--lost employment benefits, including salary, during part of the time White was on suspension.

At a general level, the right at stake here, as alleged by White, is the right not to be deprived of liberty or property based on the <u>deliberate</u> use of evidence <u>fabricated by</u> or <u>known to be</u>

11

false to a law enforcement official. We have recognized that an officer who violates this right may be subject to civil liability. See Washington v. Wilmore, 407 F.3d 274, 282 (4th Cir. 2005); see also Zahrey v. Coffey, 221 F.3d 342, 349 (2d Cir. 2000) (recognizing the right "not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity"). This claim is rooted in substantive due process. See Moran v. Clarke, 296 F.3d 638, 643-45 (8th Cir. 2002) (en banc) (concluding that "evidence that [the plaintiff] was investigated, prosecuted, suspended without pay, demoted and stigmatized by falsely-created evidence" reflected conscience-shocking behavior prohibited by substantive due process); see also Limone v. Condon, 372 F.3d 39, 44-45 (1st Cir. 2004) ("[I]f any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit. . . Actions taken in contravention of this prohibition necessarily violate due process.").

As noted earlier, although the district court granted the motion to dismiss and actually entered an order dismissing the complaint, the court alternatively granted the motion pursuant to the summary judgment standard. See Fed. R. Civ. P. 56. Because the parties submitted, and the district court considered, matters outside of the complaint, White's motion should be treated as one for summary

12

judgment.  See Fed. R. Civ. P. 12(b) ("If, on a motion asserting the defense numbered (6) to dismiss . . ., matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56. . . .").

In order for White to survive summary judgment, he must adduce evidence showing that Lt. Wright deliberately fabricated or falsified information in the investigation of White.  White cannot support his claim with unsupported allegations and speculation of fabrication.  See Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001); see also  Myers v. Morris, 810 F.2d 1437, 1460-61 (8th Cir. 1987) (requiring "a specific affirmative showing of dishonesty").  Moreover, White must adduce evidence demonstrating that Lt. Wright's alleged acts resulted in a deprivation of liberty or property.  In other words, White must create an issue of fact as to the existence of a causal link between the alleged conduct constituting the due process violation and the deprivation of a liberty or property interest.  See Landrigan v. City of Warwick, 628 F.2d 736, 744 (1st Cir. 1980) ("[W]e do not see how the existence of a false police report, sitting in a drawer in a police station, by itself deprives a person of a right secured by the Constitution and laws.").  The proper inquiry is whether the plaintiff's loss of liberty or property "was a reasonably foreseeable result of [the] initial act of fabrication--the police

13

report." Wilmore, 407 F.3d at 283; see also Zahrey, 221 F.3d at 348 (explaining that "the due process violation [was] the manufacture of false evidence" and the resulting "liberty deprivation [was] the eight months [the plaintiff] was confined, from his bail revocation (after his arrest) to his acquittal").

White has not presented direct evidence of an intent to fabricate any of the alleged false statements specifically identified by White. White has not even offered evidence of a motive for Lt. Wright to frame White for a crime he did not commit. Accordingly, White must rely solely on circumstantial evidence to raise an inference of intent. After reviewing the portions of the record offered by White in support of his claim, we conclude that he failed to raise a question of fact. White's strongest evidence of deliberate fabrication, for example, is probably Lt. Wright's statements, in his report and during his testimony at trial, that White's signature on a salvage certificate was verification that the vehicle had not been restored with stolen parts. Lt. Wright also misstated MSP regulations regarding the appropriate location for salvage inspections. There is nothing to indicate, however, that these misstatements were anything more than innocent or careless mistakes. With respect to the other misrepresentations alleged by White, Lt. Wright either corrected his own mistake or had a reasonable basis for his statements.

14

Furthermore, even if there was evidence suggesting that Lt. Wright's misstatements were deliberate fabrications, White failed to produce evidence establishing a causal link between Wright's conduct and the alleged liberty or property deprivations. White contends that he was deprived of liberty in that "he was unable to engage in his profession for over four years" and that he was deprived of property in that "he lost salary and other employment benefits to which he was entitled." Reply Brief of Appellant. In November 1995, Lt. Wright filed a "Complaint Against Personnel Report," which initiated an internal MSP investigation of White's salvage inspections at Clinton Auto to determine whether White was involved in illegal conduct. In March 1997, shortly after search warrants were executed at Clinton Auto, the MSP suspended White. His suspension continued through White's trial. Apparently, even after White's acquittal in 1999, MSP continued the suspension but reinstated pay. Finally, in October 2000, the Internal Affairs Unit (IAU) closed the investigation with a recommendation to the IAU commander, Captain Lawrence, that White be administratively charged with misconduct, including violation of criminal mail fraud laws. The administrative proceedings were later terminated by a Maryland Circuit Court, finding that the formal charges were filed beyond the statute of limitations.

Even assuming that the liberty or property interest at stake is entitled to constitutional protection, see Moran, 296 F.3d at 645,

15

we find nothing in the record before us linking Lt. Wright's specific alleged misstatements or other alleged misconduct to his administrative suspension. The only conclusion we can draw from the scant evidence in the record related to the administrative proceedings, including a transcript of an MSP hearing during which White's police powers were suspended, is that White was suspended based on his general involvement with Clinton Auto and the fact that "White had accepted money from the owner of Clinton Auto . . . for the [salvage] certificate . . . when it was signed." J.A. 470. White does not challenge either fact. There is simply nothing showing how or whether the information allegedly manufactured by Lt. Wright affected the administrative proceedings.

Finally, White focuses a significant amount of attention on the alleged destruction of an audio tape recording of Lt. Wright's interview of White. White claims that during the interview, Lt. Wright acknowledged that White approached him and indicated a concern that Najjar was involved in illegal activity. Even if this information was exculpatory, White offers no evidence tending to show that his alleged liberty deprivations resulted from Lt. Wright's alleged deliberate concealment of the information.

Accordingly, we conclude that White failed to establish a constitutional violation by Lt. Wright, even if the facts are viewed in a light most favorable to White for purposes of summary judgment.

IV.

For the foregoing reasons, we affirm the district court's award of summary judgment to Lt. Wright on each of White's claims.

<u>AFFIRMED</u>