**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 04-1822**

───────────

ARKANSAS CHRONICLE, a division of Sienna
Broadcasting Corp.; JOHN CULBERTSON,

                                    Plaintiffs - Appellees,

        versus

ROBERT J. MURPHY; STEVE MILEFSKY,

                                Defendants - Appellants,

        and

R. MARK EASLEY; SUZANNE G. DEVLIN, Acting
Police Chief of Fairfax County; JOHN T. FREY,
Clerk, Circuit Court of Fairfax County;
FAIRFAX COUNTY BOARD OF SUPERVISORS; COUNTY OF
FAIRFAX, VIRGINIA,

                                       Defendants,

        and

CITY OF OKLAHOMA CITY,

                                    Party in Interest.

───────────

Appeal from the United States District Court for the Eastern
District of Virginia, at Alexandria.  T. S. Ellis, III, District
Judge.  (CA-04-110)

───────────

Argued: March 15, 2006               Decided: May 30, 2006

───────────

Before WIDENER and WILLIAMS, Circuit Judges, and William L. OSTEEN, Senior United States District Judge for the Middle District of North Carolina, sitting by designation.

---

Reversed by unpublished opinion. Judge Williams wrote the opinion. Judge Widener wrote a separate opinion concurring in part and concurring in the result. Senior Judge Osteen wrote a dissenting opinion.

---

**ARGUED:** Robert Marvel Ross, COUNTY ATTORNEY'S OFFICE FOR THE COUNTY OF FAIRFAX, Fairfax, Virginia, for Appellants. Benjamin Gaillard Chew, PATTON BOGGS, L.L.P., Washington, D.C., for Appellees. **ON BRIEF:** David P. Bobzien, County Attorney, Peter D. Andreoli, Jr., Deputy County Attorney, Ann Gouldin Killalea, Assistant County Attorney, Fairfax, Virginia, for Appellants. Catherine Sun Wood, PATTON BOGGS, L.L.P., Washington, D.C., for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

WILLIAMS, Circuit Judge:

This case stems from the 2004 trial of Terry Nichols for the bombing of the Alfred P. Murrah Federal Building in Oklahoma City. Prior to the start of that trial, two Virginia police officers obtained and executed a search warrant at the home of John Culbertson, seizing computers and files belonging to Culbertson and his employer, the Arkansas Chronicle. The target of the search warrant was a video and still photographs of the bombing that were last seen in electronic format. Culbertson and the Arkansas Chronicle filed this 42 U.S.C.A. § 1983 (West 2003) suit against Robert Murphy and Steve Milefsky, the two police officers who executed the search, claiming violations of their constitutional rights. Officers Milefsky and Murphy moved for summary judgment on the grounds of qualified immunity, which motion the district court denied. Officers Milefsky and Murphy now appeal. While the underlying facts of this case are unique, the legal principles guiding our decision are well established and lead to a result opposite of that reached by the district court. For the following reasons, we reverse the district court's denial of qualified immunity to Officers Milefsky and Murphy.

I.

In 2004, prior to the start of Nichols's trial in Oklahoma state court, one of Nichols's attorneys spoke with attorney Thomas

3

W. Mills of Dallas, Texas.  Based on this conversation, Nichols's defense attorney filed an "Ex Parte Sealed Emergency Motion for Order to Preserve Evidence and for Subpoena Duces Tecum" with the Oklahoma trial court.  (J.A. at 193.)  In the motion, Nichols's defense attorney alleged that Mills informed him that in August 1998 Culbertson had shown him a video and still photographs on Culbertson's laptop computer depicting the Murrah Building right before and after the bombing and that the images showed a Ryder truck.[1]  The motion further alleged that Culbertson had shown Mills the video and photographs in the congressional offices of Congressman James Traficant (D-Ohio).  At that time, Culbertson was serving as a legislative aid to Traficant.  Nichols's motion also cited Culbertson's testimony before a House subcommittee, in which Culbertson stated that he had a video of a law enforcement officer describing the video images and photographs the officer had seen of the Oklahoma City bombing.  Nichols's defense team believed that these photographs could be crucial to Nichols's defense. After receiving Nichols's motion, the Oklahoma trial court held an in camera hearing and indicated that "if you came to me with this information and asked me as a judge to issue a search warrant, I probably would do it."  (J.A. at 256.)  After the hearing, the

---

[1]A Ryder truck is believed to have carried the bomb to the Murrah Building.

4

Oklahoma City prosecutor began the process of obtaining a search warrant in Virginia where Culbertson resided.

To confirm the statements made by Nichols's defense attorneys, on January 28, 2004, Oklahoma City Detective Mark Easley traveled to Dallas and spoke with attorney Mills. Mills confirmed to Detective Easley that Culbertson had shown him, on Culbertson's laptop computer at Congressman Traficant's office, a video of the Murrah Building "that was taken within minutes of when the bomb went off." (J.A. at 55.) Mills said that the first frame showed the building, the next frame showed a glow at the bottom, the next frame showed the glowing ball going up the building, and the final frame showed the building collapsed. Mills also said that Culbertson told him that an Alcohol, Tobacco and Firearms (ATF) agent had given him the video. Mills further said that Culbertson refused to go to the ATF or the FBI with the video tape because Culbertson needed to protect his source and the FBI did not want the video disclosed. During Detective Easley's conversation with Mills, Mills informed Detective Easley that he had spoken with Culbertson after Nichols's "defense attorneys had learned about his 'secret' video and pictures." (J.A. at 68.) In response to Mills's comments, Culbertson told Mills that it was going to be a "tight rope for me to walk." (J.A. at 68.)

Having received confirmation from Mills about the existence of the images, on January 30, 2004, Detective Easley traveled to

5

Fairfax County, Virginia to speak with Culbertson. From the Fairfax County Police Department, Detective Easley placed a phone call to Culbertson. The phone call was tape recorded. Easley asked Culbertson if the images and video were still available and Culbertson responded

> Well, I'm going to tell you the same thing I told Nichols's attorneys. Because of a variety of complex legal issues, there is some journalistic law involved, there is legislative privilege involved with respect to the Congress and so forth. I'm just not at liberty to divulge whether it exists, where it's at, whatever, until I've got guidance from appropriate counsel.

(J.A. at 97.) Culbertson informed Easley that he had worked for the Washington Bureau of the Arkansas Chronicle, a publishing entity since 1996, and that he maintained a home office. Easley further pressed Culbertson for information on the images, and Culbertson stated, "Well, what I can tell you is the stuff was turned over, you know, there's public stuff on it that was turned over to the House Judiciary [Committee]. And that might be the place to look, uh, for these things." (J.A. at 97.) Culbertson also informed Easley that he testified before the House Judiciary Contract Law Subcommittee on matters related to the Oklahoma City bombing in either 1999 or 2000. The House report confirms that Culbertson testified that "photos and video of the explosions at the Murrah Building" do exist and that Culbertson submitted images along with his report in 2000. See Fair Justice Act of 2000: Hearing on H.R. 4105 Before the Subcomm. on Commercial and Admin.

6

Law of the H. Comm. on the Judiciary, 106 Cong. 60-61 (2000) (statement of John Culbertson, Director, Center for Reform). Culbertson also denied to Detective Easley that he had seen a video showing a Ryder truck at the Murrah Building, and he then said that the video he submitted to the House subcommittee was the Sheriff's Department video "that you guys probably already have." (J.A. at 101.) Culbertson next informed Easley that he no longer had the computer on which he showed Mills the video. Culbertson ended the conversation by telling Detective Easley that after he had spoken with his attorney, he would call Easley. Less than an hour later, Culbertson called Detective Easley and told him that he could not speak with him because of journalistic privilege stemming from his production of the show African Lifestyles, legislative privilege because he formerly worked for a congressman, and a third privilege relating to his position as a "consultant to the Philippines." (J.A. at 104.)

Based on the information received from Mills and Culbertson's refusal voluntarily to disclose his knowledge of the status of the video, Detective Easley sought a search warrant from a Fairfax County Circuit Court. The search warrant stated that Easley wanted to search Culbertson's house to seize

> any and all computer equipment, hard disk drives, compact disks, floppy disks, magnetic tapes or other magnetic or optical media capable of storing information in an electronic, magnetic, or optical format. This information may include, but it is not limited to letters, correspondence, memoranda, journals, electronic

7

> mail, image files, database files, deleted files, partial files or other types of files found in the media or computer.

(J.A. at 65.) Detective Easley also filed a detailed affidavit setting forth the relevant facts in support of the search warrant and explaining that the officers were looking for a video and still images of the Oklahoma bombing. Detective Easley's supporting affidavit described his conversations with attorney Mills and Culbertson. Detective Easley's affidavit noted that Mills confirmed that he had seen images of the bombing, but that Mills could not recall whether he saw a Ryder truck depicted in the images and correspondingly that he did not tell Nichols's attorney that he had seen a Ryder truck. Detective Easley also stated that in his experience "as a law enforcement investigator . . . a person in possession of items of this magnitude and uniqueness is unlikely to dispose of or destroy the information. Instead, he is more likely to leave it on the computer or copy it to a disc of some sort or both." (J.A. at 69.) A Fairfax County magistrate judge signed the search warrant and Fairfax County police officers Murphy and Milefsky executed the search at Culbertson's house. On January 30, 2004, Officers Murphy and Milefsky seized the following items from Culbertson's home: eight desktop computers, two laptops, 454 diskettes, 170 CD-ROMS, 8 mini CD-ROMS, four zip disks, one hard drive, fourteen VHS tapes, four notebook binders, and one manilla folder containing documents. Officers Murphy and Milefsky then

shipped the seized items to the Oklahoma City Police Department. Upon receipt of the boxes, the Oklahoma City police department withheld opening the boxes or examining the contents until it received judicial instructions. Ultimately, the alleged video and still photographs were not found.

Culbertson and the Arkansas Chronicle then filed this suit in federal court against Officers Milefsky and Murphy alleging constitutional violations pursuant to § 1983. Officers Milefsky and Murphy moved for summary judgment on the basis of qualified immunity. The district court denied qualified immunity finding that Culbertson's Fourth Amendment rights were violated and that Officers Milefsky and Murphy should have known that the search warrant was unconstitutionally overbroad and lacking in probable cause. Officers Milefsky and Murphy timely filed an interlocutory appeal. We have jurisdiction over their legal challenge to the district court's denial of their motion for summary judgment under 28 U.S.C.A. § 1291 (West 1993). Washington v. Wilmore, 407 F.3d 274, 281 (4th Cir. 2005). "To the extent that the denial of qualified immunity rests on a question of law, the decision is final pursuant to the collateral order doctrine" and subject to de novo review. Id.

II.

"Qualified immunity shields government officials from civil liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Trulock v. Freeh, 275 F.3d 391, 399 (4th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "In considering an appeal from the rejection of a qualified immunity defense, our first task is to determine whether a constitutional right would have been violated on the facts alleged." Wilmore, 407 F.3d at 281. If no rights have been violated, then the inquiry ends. If a violation has occurred, then the court must determine whether the right violated was clearly established at the time of the violation, here the search and seizure, and "[o]nly where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable," Malley v. Briggs, 475 U.S. 335, 344-45 (1986) (internal citation omitted), or where the overbreadth of the search warrant is apparent to a reasonable police officer, Anderson v. Creighton, 483 U.S. 635, 640-41 (1987), will we deny qualified immunity.

The district court denied Officers Milefsky and Murphy qualified immunity, concluding that the search warrant was overbroad and lacked probable cause and that it would have been unreasonable for Murphy and Milefsky to believe that the search

10

warrant was not overbroad or was supported by probable cause.  We will address each of the district court's conclusions in turn.


## A.  Overbreadth

The "[F]ourth [A]mendment prohibits general warrants and general searches."  United States v. Fawole, 785 F.2d 1141, 1144 (4th Cir. 1986).   To prevent a general rummaging through a person's personal belongings, a search warrant should remove "from the officer executing the warrant all discretion as to what is to be seized."  United States v. Torch, 609 F.2d 1088, 1089 (4th Cir. 1979).   Nevertheless, the specificity required for a warrant "varies with the circumstances within a practical margin of flexibility."  United States v. Shilling, 826 F.2d 1365, 1369 (4th Cir. 1987), abrogated on other grounds by Staples v. United States, 511 U.S. 600 (1994).  For example, in a search warrant for business records, it is acceptable for the warrant to use generic terms ("such as books, records, bank statements, etc.") without detailed descriptions because the Government is unlikely to know in detail how the records are maintained.  Id.

Culbertson and the Arkansas Chronicle argue that a heightened standard of particularity is required in this case because the items seized were protected by the First Amendment and "the particularity requirement is even more stringent where the things to be seized have the presumptive protection of the First

11

Amendment." Torch, 609 F.2d at 1089. To be sure, "the constitutional requirement that warrants must particularly describe the 'things to be seized' is to be accorded the most scrupulous exactitude when the 'things' are books, and the basis for their seizure is the ideas which they contain." Stanford v. Texas, 379 U.S. 476, 485 (1965); see also New York v. P.J. Video, Inc., 475 U.S. 868, 873 (1986)(noting that "the seizure of films or books on the basis of their content implicates First Amendment concerns not raised by other kinds of seizures" (emphasis added)). Although Culbertson was employed part-time by a news media organization and some of the items seized by the officers belonged to the Arkansas Chronicle, we agree with the district court that the heightened specificity standard for items protected by the First Amendment does not apply in this case.

Here, the basis of the seizure was an attempt to shed evidentiary light on one of the most heinous crimes in this country's history, not to suppress the ideas contained in the documents. See Stanford, 379 U.S. at 485 n.16 (noting that had the Communist books at issue been ledgers of illegal activity or stolen goods, such books "might stand on a quite different constitutional footing from the [Communist] books" sought in the case). The search warrant here was incidental to any alleged First Amendment activity and was not used as "an instrument for stifling liberty of expression," which is the evil that the heightened particularity

12

standard is designed to combat.  <u>Zurcher v. Stanford Daily</u>, 436

U.S. 547, 564 (1978).  Thus, because "[t]he items named in this

warrant were evidentiary materials, and their seizure did not

threaten to deprive the public of access to protected material," we

decline to apply any heightened specificity.[2]  <u>Torch</u>, 609 F.2d at

1090 (internal quotation marks omitted).

Having rejected the application of the heightened specificity

standard, we now turn to the merits of the overbreadth argument,

applying a standard that recognizes that the necessary

particularity for a search warrant varies "according to the

circumstances and type of items involved."  <u>Id.</u>  Also, built into

this standard is "a practical margin of flexibility."  <u>Id.</u>  The

district court's conclusion that the search warrant was limitless

because it authorized Officers Milefsky and Murphy to seize "every

piece of computer equipment and every type of document that might

be stored on such equipment," (J.A. at 385), failed to equate the

---

[2]We note, however, that even if the heightened standard
applied, we would reach the same result.  The Supreme Court has
held that the "particular exactitude" requirement is satisfied when
it leaves "as little as possible to the discretion or whim of the
officer in the field."  <u>Zurcher v. Stanford Daily</u>, 436 U.S. 547,
564 (1978).  For the reasons set forth in this section, infra, the
search warrant left little to no discretion to the executing
officers.  For example, Officers Milefsky and Murphy did not have
to determine anything as difficult as whether the electronic
material they seized was "obscene" or related to Communist
thoughts, as other search warrants held to be invalid have
required.  <u>See</u> <u>id</u>.  Officers Milefsky and Murphy only had to
determine whether an item could store electronic, magnetic, or
optical data. Thus, the search warrant described with "particular
exactitude" the things to be seized.

13

circumstances of the targeted items with the language of the search warrant. Because the video and photographs were already in electronic form, they could be transferred to numerous other electronic devices and put into countless types of formats. See United States v. Reyes, 798 F.2d 380, 383 (10th Cir. 1986) (holding that "in the age of modern technology and commercial availability of various forms of items, a [search] warrant could not be expected to describe with exactitude the precise form the records would take"). We cannot and should not tie the hands of law enforcement by expecting an investigative officer to know the exact format electronically stored evidence will take. Notably, the district court did not suggest a method for narrowing or describing with increased specificity the items to be seized, and we also cannot discern a more precise way to describe items stored in electronic format. Culbertson and the Arkansas Chronicle, however, suggest that the search warrant could have limited the electronic items to be seized by specifying that only "image" files such as .jpg, .tip, .bmp, or .gif files could be searched. (Appellee's Br. at 24.) Although we recognize that image files are usually stored and labeled as such, this proposal ignores the fact that a warrant that authorized the seizure of any device "capable of storing" .jpg, .tip, .bmp, or .gif files would still authorize officers to seize "computer equipment, hard disk drives, compact disks, floppy disks, magnetic tapes or other magnetic or optical media" to allow the

14

officers to search for the .gif, .tip, .bmp, or .jpg files. Furthermore, it is possible to embed an electronic image into a word processing file or convert the image into .pdf format and still have the document labeled as a .wpd, .doc, or .pdf file, as opposed to .jpg, .gif, .tif, or .bmp. Therefore, because the search warrant and supporting affidavit described with sufficient particularity the items to be seized "within a practical margin of flexibility," we must reject Culbertson's argument that the search warrant was a general warrant. Shilling, 826 F.2d at 1369.

Next, we turn to the district court's conclusion that the search warrant was overbroad because the warrant sought images that were last seen electronically, while the warrant allowed for the seizure of "letters, correspondence, memoranda, [and] journals." (J.A. at 385.) The district court concluded that "a search warrant that allowed the police to seize letters, correspondence, memoranda, and journals in order to find a video and three still photographs is patently overbroad." (J.A. at 386.) Culbertson and the Arkansas Chronicle argue that the search warrant only provided for the seizure of electronic forms of letters, correspondence, journals, and memoranda, and thus the seizure of hard copies of such items was outside the scope of the search warrant. The search warrant references information stored in "electronic, magnetic, or optical format" and then further states that "this information may include . . . letters, correspondence, memoranda [and] journals."

15

(J.A. at 65 (emphasis added).) We agree that the most natural, close reading of the search warrant is that only <u>electronic, magnetic, or optical</u> forms of "letters, correspondence, memoranda [and] journals" could be searched. Thus, the search warrant cannot be overbroad for this reason.[3]

Finally, the district court concluded that the search warrant was overly broad because it allowed for the seizure of Culbertson's son's computer. The seizure of the son's computer does not render the search warrant overly broad because the images could have been stored on any computer within Culbertson's home to which he presumably had access, including his son's computer. Also, parents frequently pass down to their children their old computers, and because the officers were searching for old images, it would have been reasonable to search the son's computer. Moreover, to hold search warrants that allow for the search of a parent's belongings as necessarily overbroad because they also allow for the search of the belongings of a child residing with a parent would prove unworkable for investigating officers. For example, if police were searching for a stolen handgun or drugs, and the search warrant allowed for the search of the parent's home, it is unlikely that we

---

[3]The conclusion that the search warrant did not explicitly allow for the seizure of hard documents, such as the four notebooks and one manilla folder, forces us to address whether the seizure of these items outside of the search warrant violated the Fourth Amendment rights of Culbertson and the <u>Arkansas Chronicle</u>. We will return to this point in section C in the text infra.

would not allow the police to search a minor child's room within the parent's home.  See United States v. Diprima, 472 F.2d 550, 551 (1st Cir. 1973) ("[E]ven if a minor child, living in the bosom of a family, may think of a room as 'his,' the overall dominance will be in his parents."). A rule barring the search of a minor child's property that lies within a parent's home simply would encourage a parent to hide contraband with his child.

The supporting affidavit, describing the alleged video and still images and the search warrant's focus on electronic, magnetic or optical storage forms that could contain the images, "served to limit the discretion of the officers who conducted the search." Torch, 609 F.2d at 1090.  The area to be searched was confined to Culbertson's home and the items to be seized were those capable of storing electronic, magnetic, or optical data.  For these reasons, we conclude that this search warrant "falls within the practical margin of flexibility." Id.


## B.  Probable Cause

We now turn to the issue of probable cause.  "Probable cause deals with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act." Illinois v. Gates, 462 U.S. 213, 241 (1983) (internal quotation marks omitted).  "The task of the issuing magistrate is simply to make a

17

practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. at 238. "Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according great deference to a magistrate's determination." United States v. Leon, 468 U.S. 897, 914 (1984) (internal quotation marks omitted). However, "reviewing courts will not defer to a warrant based on an affidavit that does not provide the magistrate with a substantial basis for determining the existence of probable cause." Id. at 915.

The affidavit given to the magistrate provided the following pertinent statements: (1) Detective Easley, the affiant, had been an Oklahoma police officer for twelve years and had been investigating the Oklahoma City bombing for five years; (2) in 1998, Culbertson showed Mills a video and photographs of the Murrah Building before and after the bombing on a laptop computer; (3) Mills said he viewed images on Culbertson's laptop; (4) Mills said that he could not recall whether the images shown by Culbertson contained a picture of a Ryder truck as Nichols's defense attorney alleged; (5) Mills said an ATF agent gave Culbertson the video; (6)

18

Culbertson told Mills that Nichols's attorneys' knowledge about the video and photographs was "going to be a tight rope for [him] to walk"; (7) Culbertson admitted to Detective Easley that he had shown Mills a video and photographs; (8) Culbertson stated that the video and photographs were provided to the House Judiciary Committee several years ago; (9) Culbertson refused to say whether he still had copies of the video and photographs; and (10) Detective Easley's professional opinion that an individual in possession of "items of such magnitude and uniqueness [would be] unlikely to dispose of or destroy the information." (J.A. at 67-69.) The affidavit omitted the following facts known to Detective Easley: (1) Culbertson said he had shown Mills the video on a government computer; (2) Culbertson was employed by former Congressman James Traficant at the time he showed the video to Mills; and (3) Culbertson testified before the House subcommittee in 2000 and submitted a tape along with his testimony.

Although Culbertson's submission of images to the House subcommittee and the fact that Mills viewed the images on a government computer could support an inference that Culbertson no longer had the video and photographs, the remaining facts are sufficient to demonstrate a fair probability that Culbertson still possessed the video and photographs or copies thereof. Namely, Culbertson's admission to Detective Easley that he had shown Mills a video of the bombing and Culbertson's statement that he would

19

have to walk a "tight rope" because of the video and photographs are strong evidence that Culbertson still possessed the video or a copy thereof. As his congressional testimony indicates, Culbertson still had the video two years after showing it to Mills and at that point he was no longer working for the government, further suggesting that Culbertson valued the video and would have maintained copies of it. Also, Culbertson's evasive statement that journalistic and other irrelevant privileges prevented him from divulging to Detective Easley whether or not he held a copy of the video provides additional support for probable cause.[4] And finally, we find particularly astute Detective Easley's statement that an individual with possession of such a highly sought after video is likely to maintain possession of it; Culbertson was a journalist, and such information is the bread and butter of his work. A cumulative reading of the affidavit suggests that Culbertson did have a copy of the video and images, even if he had already turned over a copy of some video to the House subcommittee.[5] It is then a short, logical step to surmise that

---

[4]As pointed out by our good dissenting colleague, the mere refusal to cooperate cannot alone support a finding of probable cause, however, the refusal to cooperate may be considered along with other supporting facts in evaluating a search warrant for probable cause. See Florida v. Bostick, 501 U.S. 429, 437 (1991) (noting that a "refusal to cooperate, without more, does not furnish the minimal level of objective justification for a detention or seizure" (emphasis added)).

[5]It is unclear from the record whether the video allegedly submitted to the House subcommittee is, in fact, the video

Culbertson would have a copy of the video and images at his house or at his home office. This is a logical inference due, in part, to the nature of electronic, magnetic, and optical items because, as discussed in subsection A, such materials can be copied and stored, the video and images could easily be stored in multiple locations, including Culbertson's home. See United States v. Anderson, 851 F.2d 727, 729 (4th Cir. 1988) (adopting the view that "the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence"). We recognize that some of the individual facts alleged in the affidavit may be read to support other inferential ends, see infra dissent at pages 33-35, but we believe that the affidavit provides a substantial basis for the magistrate's determination that Culbertson retained possession of the video and images and that they would likely be found at his home. See Gates, 462 U.S. at 240 (noting that a magistrate can "draw such reasonable inferences as he will from the material supplied to him by applicants for a warrant").

Having concluded that the facts alleged in the affidavit support a finding of probable cause, we address Culbertson's and

Detective Easley was seeking. This is particularly important because Culbertson told Detective Easley that anything public he turned over to the House subcommittee. Detective Easley was not looking for "public" information, but for a secret, never publicly disclosed video of the bombing.

21

the Arkansas Chronicle's contentions that those facts were stale. "A valid search warrant may issue only upon allegations of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time. Whether the proof meets this test must be determined by the circumstances of each case." United States v. McCall, 740 F.2d 1331, 1335-36 (4th Cir. 1984) (internal quotation marks omitted). At the outset, we note that "[t]he validity of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit," United States v. Farmer, 370 F.3d 435, 439 (4th Cir. 2004) (internal quotation marks omitted), and "[m]any courts have found probable cause to exist despite substantial gaps between the observation of the evidence at a particular premises and the issuance of a search warrant," McCall, 740 F.2d at 1336.

Stale search warrants arise in two situations: (1) the government waits an extended period of time between the information provided and the execution of the warrant and (2) "the information on which [the search warrant] rested was arguably too old to furnish 'present' probable cause." Id. The district court found that this case fell into the latter category because Mills viewed the tape in the presence of Culbertson almost six years prior to the issuance of the search warrant.

22

Mills's viewing of the video and three still images six years prior is but one piece of the puzzle. And the probable cause analysis requires that we examine the totality of the circumstances. See Farmer, 370 F.3d at 439 ("[W]e must look to all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized." (internal quotation marks omitted)). Viewing all of the evidence set forth in the affidavit demonstrates that the search warrant was not stale. Except for Mills's undisputed viewing of the video in 1998, all other evidence contained in the affidavit was obtained in close proximity to the issuance of the search warrant. For example, on January 28, 2004, a mere two days before the search, Mills told Detective Easley that Culbertson told him that he was having to walk a "tight rope" with Nichols's defense attorneys. Also, Culbertson's own statements to Detective Easley, confirming that he had shown Mills a video and photographs, occurred within twenty-four hours of the issuance and execution of the search warrant. And Detective Easley's observation that no one would discard such evidence was timely and credible. See McCall, 740 F.2d at 1336 ("In some circumstances, the very nature of the evidence sought may suggest that probable cause is not diminished solely by the passage of time.").

Culbertson and the Arkansas Chronicle further argue that, because no "continuing crime" was involved, the lack of temporal

23

proximity between Mills's viewing of the video in 1998 and the issuance of the search warrant renders the search warrant stale. As previously discussed, the viewing of the video by Mills was but one supporting piece of the puzzle and, contrary to Culbertson and the Arkansas Chronicle's suggestion, the presence of a "continuing crime" is not a requirement for justifying a search warrant when a period of years lapses between one of the factual predicates and the issuance of the search warrant. See Id. at 1337 (finding search warrant not stale even though "the criminal activity alleged in the warrant is not ongoing in nature, nor the evidence sought intrinsically likely to remain at the location where it was originally observed"). In addition, the alleged video related to a report that Culbertson authored and to his testimony before the House subcommittee in July 2000-two years after Culbertson showed Mills the video. Thus, as part of Culbertson's lengthy research into the Oklahoma City bombing, it is likely that Culbertson would have kept copies of all relevant material supporting such a substantial report. To accept Culbertson's argument, we would have to assume that Culbertson, after intensely researching the Oklahoma City bombing and compiling extensive documentation, including video footage of the bombing, would have relinquished all copies of all documentation to another person or simply destroyed all such information. In light of Culbertson's statements to Detective Easley and his position as a journalist, we find this is highly

24

unlikely. Finally, a secret video of a historic event is likely to be very valuable. See, e.g., Film of JFK killing valued at $16 million, CNN.com, Aug. 3, 1999 http://www.cnn.com/US/9908/03/zapruder.02/ (noting that Abraham Zapruder's film of the Kennedy assassination was valued at $16 million). Having examined all the relevant evidence set forth in the affidavit, along with the nature of the evidence sought, we conclude that the search warrant was not based on stale information.

C. Reasonable Officer's View of the Search Warrant

We now return to the issue of whether the seizure of items outside of the search warrant violated Culbertson's and the Arkansas Chronicle's constitutional rights. At the outset we readily acknowledge that "[i]f the scope of the search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more." Horton v. California, 496 U.S. 128, 140 (1990). However, even when a constitutional violation is found, qualified immunity may still attach if a reasonable officer would not have realized that he was exceeding the scope of the search warrant. Saucier v. Katz, 533 U.S. 194, 202 (2001). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general

25

proposition." Id. at 201. To put it more concisely "the unlawfulness must be apparent." Anderson, 483 U.S. at 640-41.

We begin our analysis by noting that the search warrant clearly authorized the seizure of items in "electronic, magnetic, or optical format." Our conclusion that the search warrant did not authorize the seizure of paper forms of "letters, correspondence, memoranda, [and] journals" came only after carefully examining the sentence structure of the search warrant. We believe it would not have been unreasonable for a police officer to interpret the words "letters, correspondence, memoranda, [and] journals" as allowing for the seizure of paper copies of these items-one typically thinks of these items in their physical format, as opposed to their electronic, magnetic, or optical format. See Mazuz v. Maryland, 442 F.3d 217, 225 (4th Cir. 2006) ("In order to satisfy the reasonableness requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government is not that they always be correct, but that they always be reasonable." (internal quotation marks and alterations omitted)). For example, the word "letter" is often used to describe the physical paper used for communication, whereas, the word "email" is most often associated with electronic communication that remains in electronic form. We further recognize that Officers Milefsky and Murphy knew by way of the attached affidavit that they were searching for a video and

26

still photographs and common sense stands to reason that electronically stored images, such as the still photographs, could be printed out and stored in physical form amongst "letters, correspondence, memoranda, [and] journals." It is also worth noting that the four notebook binders and one manilla envelope contained information related to Culbertson's research on the Oklahoma City bombing. This information coupled with the common perception that "letters, correspondence, memoranda, and journals" typically reference hard copies may not have placed a reasonable officer on notice that the seizure of the notebooks and manilla folder was outside the scope of the search warrant and possibly violated constitutional rights. Moreover, the fact that the four notebooks and one folder were the only items seized outside of the scope of the search warrant also suggests that the mistake was a reasonable one. We, therefore, cannot say that the unlawfulness of the seizure of the notebooks and folder was apparent. Officers Milefsky and Murphy are entitled to qualified immunity.

III.

In summary, we conclude that the search warrant properly described with sufficient particularity the items to be seized, that probable cause existed to support the issuance of the search warrant, and that qualified immunity shields Officers Milefsky and Murphy from any constitutional violations resulting from the

27

seizure of the notebooks and manilla folder.  Accordingly, the district court's order is

REVERSED.

WIDENER, Circuit Judge, concurring:

I concur in the result and in large part with the opinion of the court. However, the search warrant is perfectly plain to me. It states in terms that the officers might:

> search for . . . magnetic or optical materials . . . capable of storing information in electrical or optical format.

The record in this case shows the officers neither searched for, nor took, nor stored anything else. So I think that it is patent from the record and the face of the warrant that no unlawfulness was apparent.

OSTEEN, Senior District Judge, dissenting:

I agree with the majority opinion that the warrant was not overbroad. I disagree with the conclusion that there was probable cause to support the issuance of a search warrant. Because the link between Culbertson's possession of the images in the late 1990's and the possibility of the presence of the images in Culbertson's home in 2004 is too speculative, I respectfully dissent from the majority's conclusion that Officers Murphy and Milefsky are entitled to qualified immunity.

The first step in determining whether a defendant is entitled to qualified immunity is a determination of whether a right has been violated. Washington v. Wilmore, 407 F.3d 274, 281 (4th Cir. 2005). Although the majority found no such violation, I disagree because the search warrant was not supported by probable cause. To determine whether a search warrant is supported by probable cause, the magistrate issuing the warrant must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . .[,] there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). "When reviewing the probable cause supporting a warrant, a reviewing court must consider only the information presented to the magistrate who issued the warrant." United States v. Wilhelm, 80 F.3d 116, 118 (4th Cir. 1996).

30

I begin with the observation that the affidavit contained no direct evidence that Culbertson had the sought-after images in his home in 2004 or at any other time, and the record indicates that there is no such evidence. No one involved in the matter ever saw the images at the home or learned that they were there. Instead, to conclude that there was probable cause that Culbertson had the images in his home in 2004, the majority relies on three items of information: (1) the fact that Culbertson retained the images between 1998, when he showed them to Mills, and the time he testified before a House of Representatives subcommittee in 2000; (2) statements made by Culbertson that the request for the images put him in a bad position and that he could not disclose whether he remained in possession of them; and (3) Detective Easley's statement that an individual in possession of such unique items was unlikely to give up possession. These items, either alone or in combination, are far too speculative to support a finding of probable cause that Culbertson had possession of the images in 2004, and they provide nothing to link the images to Culbertson's home.

The fact that Culbertson had retained the images between 1998 and his testimony before the congressional committee does not support such an inference. The affidavit contains very little detail on the matter. Although the record now shows that Culbertson testified in 2000, the affidavit indicates only that

31

Easley saw the images on August 26, 1998, and that Culbertson had turned a copy over to the House Judiciary Committee several years before the affidavit was produced. These two facts give rise to the inference that Culbertson retained the images for an unspecified period of time under unspecified conditions, but they do not support the inference that Culbertson continued to possess the images anywhere, much less at his home, for another unspecified period of time under other unspecified circumstances.

I turn next to Easley's statement that, in his experience, "a person in possession of items of this magnitude and uniqueness is unlikely to dispose of or destroy the information." This statement is less a piece of information that supports a finding of probable cause than a conclusion that, in Easley's opinion, the other facts support such a finding. Easley's statement is unhelpful for two reasons.

To the extent that the statement is relevant because of Easley's status as a law enforcement officer, it adds no evidentiary weight for the required finding. There is no question that in many situations a law enforcement officer's experience is highly relevant to a determination of probable cause. See, e.g., United States v. Collins, 412 F.3d 515, 518 (4th Cir. 2005) (finding that officers had probable cause to make an arrest when, in light of their experience, the defendant's behavior suggested he possessed illegal drugs). An officer's experience with criminal

32

activity, such as drug dealing, will provide him with insight unavailable to even experienced individuals outside the profession. This case, however, provides a unique situation that involved no criminal activity, and it is not obvious how an officer's experience might be more valuable than that of someone in a different profession.  It is unlikely that Easley, in his law enforcement experience, had ever encountered a situation similar to this one.  If he had, he should have provided more detail to allow the magistrate to evaluate the strength of his statement.  If he had no special experience, his statement is one of opinion and should not weigh in favor of a finding of probable cause.  See Gates, 462 U.S. at 239 ("[A magistrate's] action cannot be a mere ratification of the bare conclusions of others.").  A reasonable magistrate cannot, without further information, assume that a law enforcement officer has specialized experience with matters outside the limits of ordinary law enforcement experience and training.

To the extent that the information is evaluated independently of Easely's experience, it is not an inference from facts but mere speculation.  "[A] guess, based not on specific and reliable facts but on a broad generalization" is insufficient to support the issuance of a search warrant.  Doe v. Broderick, 225 F.3d 440, 452 (4th Cir. 2000).  It may well be true that many people retain unique things, but it is also true that many people do not make an effort to retain, on their home computers, computer files from jobs

33

they held years before.  There is no evidence in the affidavit suggesting that Culbertson did, in fact, perceive the images as something he personally wanted to retain indefinitely.  There is no evidence that he attached particular value to them.[1]  There is no evidence in the affidavit that Culbertson was still involved in investigating the Oklahoma City bombing or that these images were of particular use in that investigation.  In short, even assuming that Easley may have made a true statement about the way some people behave, it is only speculation that Culbertson behaved that way in this instance, and such speculation is insufficient to support a finding of probable cause.

Finally, the statements made by Culbertson provide no probable cause that Culbertson possessed the images at his home in 2004.  The majority refers to two statements Culbertson made to different people.[2]  The first is Culbertson's statement to Easley that "it was going to be a 'tight rope for [Culbertson] to walk.'"  The second is Culbertson's refusal to confirm or deny his possession of

---

[1]While I agree with the majority that historical film may be valuable, there is no evidence that the three digital still images here have any particular value.  The value of the Zapruder film is probably not a good indicator of the value of these images.  Further, even assuming substantial value in the images, such value does not permit an inference that the valuable property would have been kept at Culbertson's home.  On the contrary, value may import the opposite inference:  that they would have been kept in a safer place.

[2]A third statement found in the affidavit, made by Culbertson to defense attorney Mark Earnest, is subject to the same analysis as these two statements.

the images during his telephone conversation with Easley. These statements are of very low probativity regarding Culbertson's possession of the images.

For both statements, there are many ways that they could be interpreted. The majority's interpretation is that Culbertson had the images and did not want to give them to Nichols's attorneys. Even under that interpretation, the statements contain nothing to link the images to Culbertson's home. A more plausible interpretation of the statements is that Culbertson did not want to be placed in the position of having to reveal information about the source of the photographs, regardless of whether they were in his possession at that time. Another plausible interpretation is that Culbertson did not want to have any further connection with the Nichols trial but was afraid that he would be forced in by circumstances beyond his control. Both of these alternatives are supported by the facts available to Easley, though, for some reason, not provided to the magistrate. They are offered here only as examples of ways those statements could be understood, and there are many other possibilities. It would not have been possible for Easley to produce information suggesting that all of the possible innocent interpretations of Culbertson's ambiguous statements were false. Nonetheless, because the statements were so readily subject to various interpretations, Easley should have offered an explanation of why his preferred interpretation was in

35

some way better than the alternatives.  To be fair to Easley, he did not, in the affidavit, explicitly state that he personally believed those statements indicated that Culbertson still had possession of the images.  In fact, he offered very little context for the statements.[3]  Without such context, no reasonable, disinterested magistrate could conclude that the statements were likely to mean that Culbertson had the images.  They do not create a "fair probability" that the images would be found in Culbertson's home.

Even if the magistrate read the statements to indicate that Culbertson likely possessed the images, such a reading would not support a finding of probable cause.  The Supreme Court has stated that "a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."  Florida v. Bostick, 501 U.S. 429, 437 (1991); see also United States v. Alexander, 835 F.2d 1406, 1409 n.3 (11th Cir. 1988) ("[A] defendant's refusal to consent to a search cannot establish probable cause to search.").  Culbertson's statement

---

[3]Among the information not included in the affidavit was a portion of the conversation between Easley and Culbertson in which Culbertson affirmatively stated that the images were not on his computer.  He also indicated that the images probably did not exist anymore, but, if they did, they would be in an archive belonging to a former member of Congress.  Although there is no evidence that these statements were intentionally and wrongfully omitted, it is difficult to understand why they would not have been included, since they would have been valuable information for the magistrate to consider.

about a tightrope is no more than an expression that he did not want to cooperate with the investigation, and his statement to Easley was clearly such an assertion. Furthermore, these statements are the only pieces of information in the affidavit dating from 2004. Thus, the information in the affidavit can be summarized as asserting that Culbertson had the images in the late 1990's and refused to cooperate in 2004. Just as Culbertson's refusal to cooperate could not serve as a basis for a finding of probable cause that he was subject to seizure, it should not serve as a basis for a finding of probable cause to search his home in 2004.

The purpose of the analysis is not to dissect the information in the affidavit by showing that each of the statements has a potentially innocent interpretation. "[I]nnocent behavior frequently will provide the basis for a showing of probable cause . . . ." Gates, 462 U.S. at 245 n.13. Nonetheless, when viewed in light of the totality of the circumstances, the information suffers from the same deficiency suffered by each individual part. There is no specific or reliable fact that could empower an impartial observer to do more than conjecture on the meaning of the rest of the available information. After examining the evidence provided by Easley to the magistrate in his affidavit, I conclude that it was certainly possible that Culbertson had the images in his home in 2004. Nonetheless, that conclusion relies entirely on a

37

particular interpretation of ambiguous statements and speculation about human nature. Although the standard of probable cause is not a high one, it calls for more than was provided to the magistrate.

Having concluded that the warrant was invalid, I would further conclude that Officers Murphy and Milefsky were in possession of sufficient information to know that the warrant lacked probable cause. The second step in determining whether a defendant is entitled to qualified immunity is whether the right violated was clearly established at the time of the violation. Wilmore, 407 F.3d at 281. As applied to warrants, qualified immunity should be denied when "the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable."[4] Malley v. Briggs, 475 U.S. 335, 344-45 (1986). Clearly, the affidavit lacked any direct evidence that the images were in Culbertson's home. Any conclusion to that effect drawn from the information in the affidavit was only speculation. Thus, it is a necessary conclusion that the affidavit is completely lacking in indicia of probable cause for Culbertson's home to be searched. Murphy and Milefsky, who were familiar with the details of the investigation and fully informed about the contents of the warrant application, should have been objectively aware that the

---

[4]This is not to exclude the possibility that some officers participating in such a search under an invalid warrant may be entitled to qualified immunity by reason of their limited participation in the execution of the warrant.

level of speculation involved in the warrant could not support a finding of probable cause, even if a magistrate issued the warrant. They did have a subjective belief that it was likely Culbertson was in possession of the images, but the lack of a factual basis for such a belief, especially with respect to the location of the images, renders it unreasonable. As a result, qualified immunity should be denied. I would therefore affirm the trial court's opinion.