PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

EARL WASHINGTON, JR.,
            *Plaintiff-Appellee,*

v.

CURTIS REESE WILMORE,
            *Defendant-Appellant,*

and

KENNETH H. BURAKER; CHARLES
JONES; HARLAN LEE HART; GERALD
YANCEY; GARY L. CLOSE; DENNY M.
SLANE; TERRY SCHRUM; LUTHER COX;
DENNY A. ZEETS; TOWN OF
CULPEPER, VIRGINIA; FAUQUIER
COUNTY, VIRGINIA; MARY L. JONES,
            *Defendants.*

No. 04-1818

Appeal from the United States District Court
for the Western District of Virginia, at Charlottesville.
Norman K. Moon, District Judge.
(CA-02-106-3)

Argued: December 1, 2004

Decided: April 28, 2005

Before WILKINS, Chief Judge, and MOTZ
and SHEDD, Circuit Judges.

Affirmed by published opinion. Chief Judge Wilkins wrote the opinion, in which Judge Motz joined. Judge Shedd wrote a concurring opinion.

**COUNSEL**

**ARGUED:** William Gray Broaddus, MCGUIREWOODS, L.L.P., Richmond, Virginia, for Appellant. Peter J. Neufeld, COCHRAN, NEUFELD & SCHECK, L.L.P., New York, New York, for Appellee. **ON BRIEF:** Brian E. Pumphrey, MCGUIREWOODS, L.L.P., Richmond, Virginia, for Appellant. Deborah L. Cornwall, COCHRAN, NEUFELD & SCHECK, L.L.P., New York, New York; Robert T. Hall, HALL, SICKELS, FREI & KATTENBURG, P.C., Reston, Virginia, for Appellee.

---

**OPINION**

WILKINS, Chief Judge:

Earl Washington, Jr. brought this action against Curtis Wilmore[1] and others, alleging various constitutional violations in connection with his conviction and death sentence for the rape and murder of Rebecca Lynn Williams. *See* 42 U.S.C.A. § 1983 (West 2003). The district court dismissed or granted summary judgment to all defendants on all claims except for Washington's claim that Wilmore fabricated evidence. As to that claim, the district court denied qualified immunity. Because we conclude that Washington has alleged the violation of a clearly established constitutional right, we affirm.

I.

A.

Williams was raped and murdered in her Culpeper, Virginia apartment on June 4, 1982. Her assailant stabbed her 38 times and left her for dead, with her two young children in the apartment. Before she died, Williams stated that she was attacked by a black man with a beard.

---

[1]Wilmore is deceased, and this appeal is being pursued by Wilmore's estate. We use the name "Wilmore" to designate both Wilmore and his estate.

Almost one year later, in the early morning hours of May 21, 1983, Washington was arrested in Fauquier County, Virginia, for breaking into the apartment of an elderly neighbor and beating her with a chair. He also stole a gun from the victim, which he subsequently used to shoot his brother in a dispute over a woman.

After his arrest, Washington was questioned by Fauquier County Sheriff's deputies Terry Schrum and Denny Zeets. Washington confessed to several crimes during the course of the interrogation, including the rape and murder of Williams. Schrum and Zeets notified Culpeper law enforcement authorities of the situation.

On the morning of May 22, Wilmore—an agent of the Virginia State Police who had been involved in the Williams investigation from the outset—and Culpeper police officer Harlan Lee Hart proceeded to Fauquier County to interview Washington. They met with Washington at approximately 10:00 a.m., informed him of his rights with respect to custodial interrogation,[2] and questioned him for approximately one hour. Following this, Wilmore produced a written statement by asking Washington essentially the same questions and writing out, by hand, the questions and Washington's answers. This statement was subsequently typed by an assistant.

Two days later, Wilmore wrote a police report regarding the interrogation of Washington. In the report, Wilmore stated that Washington "gave pertinent information about the crime that no one knew with the exception of himself." J.A. 448. Wilmore's report did not specify what this information was, however.

During his testimony at Washington's trial for the rape and murder of Williams, Wilmore gave the following pertinent testimony regarding his initial questioning of Washington:

> I asked him what occurred at this point and he said I made her undress and why did you make her undress . . . I wanted to make love to her . . . did she want to make love with you . . . no, I was holding a knife on her. Did you have sex with

---

[2]*See Miranda v. Arizona*, 384 U.S. 436, 479 (1966).

her? One time. Did you stick her with a knife? I stabbed her once or twice before I left the apartment. I asked him at this point, when you left the apartment, did you take anything from it, anything at all? No. *Did you leave anything in the apartment? My shirt.* At this point I asked Lt. Hart to go to his car, since we had a shirt we had been working with, and to secure it. He brought the shirt in, in a grocery type bag, and I took the shirt out and held it in front of Mr. Washington and asked him if it was his shirt. He said yes, it was his. I asked him how did he know that it was his and he continued, that was the shirt I had on that day. *I then asked him what makes it different or what makes it outstanding. He said, there's a patch on the pocket . . . had been ripped off.*

*Id.* at 475 (emphasis added). Later in his testimony, Wilmore read to the jury the written statement of the interrogation of Washington. In part, that statement read:

  Hart: Did you leave any of your clothing in the apartment?

  Washington: My shirt.

  Hart: The shirt that has been shown you, is it the one you left in the apartment?

  Washington: Yes, sir.

  Wilmore: How do you know it is yours?

  Washington: That is the shirt I wore.

  Hart: What makes it stand out?

  Washington: A patch had been removed from the top of the pocket.

*Id.* at 495 (internal quotation marks omitted). The fact that the perpetrator of the rape and murder had left a shirt in the apartment had not been revealed to the public.

Washington was convicted and sentenced to death. All appeals and collateral review proceedings in state and federal court were denied. In late 1993, however, DNA testing indicated that semen recovered from Williams contained a genetic marker not possessed by her, her husband, or Washington. This evidence was submitted to the governor of Virginia, who issued a conditional pardon commuting Washington's death sentence to "life imprisonment with the right of parole." *Id.* at 527. The governor declined Washington's request for an absolute pardon, stating that "a review of the trial evidence, including [Washington's confession,] reveals that he had knowledge of evidence relating to the crime which it can be argued only the perpetrator would have known." *Id.* at 526.

Additional DNA testing conducted in 2000 conclusively excluded Washington as a contributor of the semen found at the crime scene. Based on these results, in October 2000 the governor granted Washington an "Absolute Pardon" for the rape and murder. *Id.* at 530. The governor explained that "a jury afforded the benefit of the DNA evidence and analysis available to me would have reached a different conclusion regarding the guilt of Earl Washington." *Id.*

B.

In May 1993, Wilmore and Hart met with Assistant Attorney General John H. McLees, Jr. and told him that "they had been troubled for years that Washington's sentence was based only on his own confession without any corroborating physical evidence . . . especially because of Washington's limited mental abilities." *Id.* at 523. Wilmore contacted McLees in October, and the two discussed the case "at some length." *Id.* In a subsequent memorandum (the McLees memorandum), McLees recorded that

> [Wilmore] told me that he felt very uneasy about how the record reflects Washington's confession was obtained, particularly with respect to the incriminating shirt found at the scene which Washington identified as his. Specifically, Wilmore said that he felt like either he or Hart must have mentioned the shirt to Washington before Washington said he left the shirt at the scene, and that his testimony in the

record did not accurately reflect that the shirt had been first
mentioned by the police.

*Id.* McLees called Wilmore the next day to ask whether Wilmore
"may have been trying to tell me that he knew his testimony was not
accurate or had omitted material facts." *Id.*

> Wilmore told me he felt like he must have asked Washing-
> ton something about the shirt, and that the transcript just did
> not read right. It did not "go down" exactly as he said in the
> statement. Wilmore said that he or Hart must have men-
> tioned it.—"did you leave your shirt?" He could not say with
> 100% certainty that he remembered saying that to Washing-
> ton, but he thinks that's the way it went down.

*Id.*

Wilmore further related an encounter he had with a psychiatrist
during the trial, when both had been excluded from the courtroom.
When Wilmore told the psychiatrist that he was troubled by the case,
the psychiatrist responded that Wilmore "should not worry about it."
*Id.* at 524.

> Wilmore said he then "went in and gave [Washington] both
> barrels." When I asked Wilmore specifically whether he felt
> at the time of the trial that his testimony was inaccurate, he
> said absolutely not. He did, however, agree that he had
> intended his testimony to be a mere general summary of the
> conversation with Washington, rather than a verbatim
> account of it. He said that, had he been asked specifically by
> defense counsel at the time of trial whether he had men-
> tioned the shirt first or whether Washington had, he would
> have said that he mentioned the shirt first.

*Id.*

## C.

Washington filed this action in September 2002, alleging, as is rel-

evant here, that (1) his confession to the rape and murder of Williams was false and had been coerced by Wilmore, Hart, Schrum, and Zeets; (2) the officers had failed to disclose exculpatory information, including the fact that the confession was fabricated; and (3) the officers had failed to investigate other information that would have exonerated Washington.[3]

In February 2004, the district court granted summary judgment to the officers on claims (2) and (3) on the basis of qualified immunity. *See Washington v. Buraker (Washington I)*, 322 F. Supp. 2d 692, 699-702 (W.D. Va. 2004). With respect to claim (1), the court concluded that the allegations of the complaint stated constitutional claims for coercion of a confession and fabrication of evidence. *See id.* at 697-98. The court therefore allowed Washington to conduct discovery "on the limited issue of whether [the officers] had actual knowledge of Washington's innocence at the time of Washington's interrogation." *Id.* at 698.

Following discovery, the district court granted summary judgment to the officers on Washington's claim that his confession was coerced. *See Washington v. Buraker (Washington II)*, 322 F. Supp. 2d 702, 712-15 (W.D. Va. 2004). The court also granted summary judgment to Hart on the fabrication claim,[4] concluding that Washington had failed to proffer any evidence that Hart had represented that Washington possessed nonpublic information about the murder. *See id.* at 712. The court denied summary judgment as to Wilmore, however, reasoning that Washington had proffered evidence from which a reasonable juror could conclude that Wilmore possessed nonpublic information about the crime and falsely represented that Washington had volunteered that information during interrogation. *See id.* The court further concluded that these facts, if proved, would establish a constitutional violation because "there is a reasonable likelihood Wilmore's testimony regarding Washington['s] confession that he had left his shirt at the Williams murder scene could have affected the judgment of the jury." *Id.*

---

[3]This claim also named Town of Culpeper police officer Kenneth Buraker.

[4]Washington withdrew the fabrication claim against Zeets and Schrum.

II.

Wilmore first argues that the district court lacked subject matter jurisdiction to consider Washington's claims because success on those claims would necessarily imply the invalidity of his convictions, thereby violating the *Rooker-Feldman* doctrine. *See Dist. of Columbia Ct. App. v. Feldman*, 460 U.S. 462, 482-86 (1983); *Rooker v. Fid. Trust Co.*, 263 U.S. 413, 415-16 (1923).[5] We disagree.

The *Rooker-Feldman* doctrine bars "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 125 S. Ct. 1517, 1521-22 (2005); *see Johnson v. De Grandy*, 512 U.S. 997, 1005-06 (1994) ("[A] party losing in state court is barred from seeking what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights."); *Am. Reliable Ins. Co. v. Stillwell*, 336 F.3d 311, 316 (4th Cir. 2003). The doctrine preserves federalism by ensuring respect for the finality of state court judgments, and it preserves the separation of powers by ensuring that federal district courts exercise only original jurisdiction and that review of state court judgments is conducted only by the United States Supreme Court, as Congress has instructed. *See Brown & Root, Inc. v. Breckenridge*, 211 F.3d 194, 198-99 (4th Cir. 2000). Thus, while the *Rooker-Feldman* doctrine may bear some resemblance to the rules of res judicata, the doctrine is distinct from, and should not be confused with, those rules. *See Moore v. City of Asheville*, 396 F.3d 385, 391 (4th Cir. 2005) (describing res judicata and *Rooker-Feldman* as "separate, but closely related doctrines"); *accord Exxon Mobil*, 125 S. Ct. at 1527 (explain-

---

[5]Although Wilmore raised this issue before the district court, the court has thus far not ruled on it. Nevertheless, because the issue is a jurisdictional one, *see Plyler v. Moore*, 129 F.3d 728, 731 & n.6 (4th Cir. 1997), it is properly before us at this time, *see Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 390 (4th Cir. 2004) (en banc) ("[Q]uestions of subject-matter jurisdiction may be raised at any point during the proceedings and may (or, more precisely, must) be raised *sua sponte* by the court.").

ing that the continuing validity, after entry of judgment in state court, of a properly filed, concurrent federal action depends not on the *Rooker-Feldman* doctrine but on state preclusion law).

The *Rooker-Feldman* doctrine bars lower federal courts from considering not only issues raised and decided in the state courts, but also issues that are "inextricably intertwined" with the issues that were before the state court. *Feldman*, 460 U.S. at 486; *see Plyler v. Moore*, 129 F.3d 728, 731 (4th Cir. 1997). "The 'inextricably intertwined' prong of the doctrine bars a claim that was not actually decided by the state court but where success on the federal claim depends upon a determination that the state court wrongly decided the issues before it." *Brown & Root*, 211 F.3d at 198 (internal quotation marks omitted); *see Exxon Mobil*, 125 S. Ct. at 1527 (explaining, in context of concurrent state and federal litigation, that question for *Rooker-Feldman* purposes is not simply whether issue has been litigated in state court but whether the federal plaintiff seeks to "undo" an unfavorable state court judgment).

Applying these principles to this case, we conclude that the *Rooker-Feldman* doctrine does not bar Washington's claim.[6] As noted

---

[6]The parties dispute whether Washington's absolute pardon avoids any impact the *Rooker-Feldman* doctrine might otherwise have. *Compare Jordahl v. Democratic Party of Va.*, 122 F.3d 192, 202 (4th Cir. 1997) (noting that the *Rooker-Feldman* inquiry does not depend on "whether the state court judgment is presently subject to reversal or modification"), *with Burrell v. Virginia*, 395 F.3d 508, 511-12 (4th Cir. 2005) (stating that plaintiff's § 1983 claim was not barred by *Rooker-Feldman* because his conviction had been dismissed, and thus the § 1983 claim did not allege that the state judgment violated his rights). To the extent that this remains an issue after the recent decision of the Supreme Court in *Exxon Mobil*, we conclude that the absolute pardon issued by the governor of Virginia removes any bar to this proceeding that the *Rooker-Feldman* doctrine would otherwise impose. *See Black's Law Dictionary* 1113 (6th ed. 1990) (An absolute pardon "reaches both the punishment prescribed for the offense and the guilt of the offender. It obliterates in legal contemplation the offense itself.").

Apparently in light of Washington's argument regarding the status of his conviction, Wilmore argues for the first time in his reply brief that

above, Washington claims that Wilmore falsely reported to the prosecutor that Washington possessed nonpublic information about the crime. It is clear that no issue regarding Wilmore's truthfulness on this point was raised at trial. Although Washington's counsel did probe certain aspects of Wilmore's account of Washington's confession, he did not question Wilmore regarding the shirt.

We also conclude that Wilmore's truthfulness on this point was not inextricably intertwined with the issues presented to the state court during Washington's criminal trial. The question we must ask in making this determination is whether a federal court finding that Wilmore was untruthful regarding Washington's independent knowledge of the shirt would have the effect of undoing Washington's criminal conviction for the murder of Rebecca Williams. It would not. Washington challenges not his conviction but rather one aspect of the means by which that conviction was achieved. *Cf. Jordahl v. Democratic Party of Va.*, 122 F.3d 192, 202 (4th Cir. 1997) (distinguishing between "actions seeking review of the state court decisions themselves and those cases challenging the constitutionality of the process by which the state court decisions resulted"). Put differently, Washington's claim of injury rests not on the state court judgment itself, but rather on the alleged violation of his constitutional rights by Wilmore.

Additionally, we note that there is simply no mechanism by which Washington could have obtained from the state court a resolution of the question of Wilmore's truthfulness regarding Washington's independent knowledge about the shirt. A criminal jury decides the question of a defendant's guilt or innocence; it does not make

Washington's claim must be dismissed pursuant to *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994) (holding that a § 1983 plaintiff cannot bring an action for damages based on an allegedly unconstitutional conviction unless the conviction "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus"). This argument comes too late. *See United States v. Brower*, 336 F.3d 274, 277 n.2 (4th Cir.) (stating that arguments not made in the opening brief are waived), *cert. denied*, 540 U.S. 936 (2003).

particularized findings regarding the credibility of individual witnesses generally or with respect to a specific item of testimony.

### III.

Having concluded that we have subject matter jurisdiction, we turn to the merits of Wilmore's appeal.

### A.

Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In considering an appeal from the rejection of a qualified immunity defense, our first task is to determine "whether a constitutional right would have been violated on the facts alleged." *Saucier v. Katz*, 533 U.S. 194, 200 (2001). If so, we must then proceed to consider whether the right asserted was clearly established at the time of the alleged violation. *See id.* In answering this latter question, the relevant inquiry is whether "it would be clear to an objectively reasonable officer that his conduct violated [the] right." *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002); *see Malley v. Briggs*, 475 U.S. 335, 341 (1986) (explaining that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

Our jurisdiction to review an order denying summary judgment on the basis of qualified immunity rests on 28 U.S.C.A. § 1291 (West 1993), which allows us to consider appeals from "final decisions" of the district court. To the extent that the denial of qualified immunity rests on a question of law, the decision is "final" pursuant to the collateral order doctrine of *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546-47 (1949). *See Behrens v. Pelletier*, 516 U.S. 299, 306 (1996). And, such a denial is subject to de novo review. *See Burrell v. Virginia*, 395 F.3d 508, 512 (4th Cir. 2005).

Our appellate jurisdiction does not extend, however, to questions of "evidence sufficiency," such as whether the plaintiff has offered

sufficient evidence to create a genuine question of material fact. *John-son v. Jones*, 515 U.S. 304, 313 (1995) (internal quotation marks omitted). The question of whether the evidence is sufficient to create a genuine issue of material fact is closely related to the factual issues that must be decided at trial. *See id.* at 314. Hence, questions of evidence sufficiency fail the "separability" prong of the *Cohen* analysis. *See Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978) (stating that in order to be appealable under *Cohen*, a collateral order must, *inter alia*, "resolve an important issue *completely separate* from the merits" (emphasis added)); *see also Behrens*, 516 U.S. at 313 ("[I]f what is at issue in the sufficiency determination [on review of a denial of qualified immunity] is nothing more than whether the evidence could support a finding that particular conduct occurred, the question decided is not truly 'separable' from the plaintiff's claim, and hence there is no 'final decision' under *Cohen* . . . ."). In other words, we may review an official's contention that the facts alleged do not state a violation of clearly established law; we may not review the official's claim that the appellee failed to create a genuine issue of material fact with respect to whether the acts occurred as alleged. *See generally Winfield v. Bass*, 106 F.3d 525, 529-30 (4th Cir. 1997) (en banc) (discussing this distinction).

B.

With the above principles in mind, we turn to the question of whether the facts alleged by Washington amount to the violation of a constitutional right. The right alleged by Washington, defined at the appropriate level of generality, is "the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity." *Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000). The alleged "fabricated evidence" here is Wilmore's false claim that Washington possessed nonpublic knowledge about the crime, *i.e.*, that the perpetrator left a shirt at the crime scene.

Wilmore disputes this statement of the asserted constitutional violation, maintaining that Washington's claim is really nothing more than a clever rephrasing of an assertion that Wilmore violated *Brady v. Maryland*, 373 U.S. 83, 87 (1963), by failing to disclose exculpatory evidence. According to Wilmore, Washington's claim is simply that Wilmore failed to disclose an exculpatory fact—that Washing-

ton's "knowledge" of the shirt was the product of leading questions—even though he was never asked whether he used leading questions, and even though Washington concedes that the use of leading questions does not violate a suspect's constitutional rights. *Cf. Mann v. Thalacker*, 246 F.3d 1092, 1100 (8th Cir. 2001) (rejecting claim that confession was coerced "simply because [the suspect] was interrogated on little sleep by an officer who used some leading questions and sometimes prodded [the suspect] to be more forthcoming"). We cannot accept this characterization of the constitutional right. What Washington challenges here is not the failure to disclose exculpatory evidence, but rather the creation of false evidence. *Cf. Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003) (holding that false police report did not violate *Brady* because "[t]he problem was not that evidence useful to [the criminal defendant] was being concealed; the problem was that the detectives were giving false evidence").

Having identified the right at stake, we next must decide whether the facts, viewed in the light most favorable to Washington, establish a violation of that right. Demonstration of a violation of Washington's constitutional right requires, in this context, proof that Wilmore fabricated evidence and that the fabrication resulted in a deprivation of Washington's liberty. *See Zahrey*, 221 F.3d at 349.

In concluding that the facts alleged by Washington amounted to the violation of a constitutional right, the district court looked primarily to the May 24, 1983 police report, in which Wilmore stated that Washington "gave pertinent information about the crime that no one knew with the exception of himself." J.A. 448. Given Washington's admitted fabrication of several details about the crime, including the fact that he was driven to the apartment complex by a friend named Billy, we agree with the district court that it is "unclear" whether Wilmore's statement refers to Washington's knowledge of the shirt. *Washington II*, 322 F. Supp. 2d at 710. We are, however, bound to accept the determination of the district court that the proper interpretation of Wilmore's statement is subject to dispute. Accordingly, we accept for purposes of this appeal that Wilmore falsely stated in his police report, referring to the shirt, "that Washington, when interrogated, divulged non-public information about the Williams murder." *Id.*

We now turn to the causation prong, which requires us to deter-mine whether the facts alleged by Washington demonstrate that the loss of liberty—*i.e.*, Washington's conviction for the murder of Rebecca Williams and subsequent incarceration—resulted from Wil-more's fabrication of evidence. Wilmore's only argument on this point is that he cannot be held liable for his testimony at trial, an indisputable proposition, *see Briscoe v. LaHue*, 460 U.S. 325, 345-46 (1983). The proper inquiry, however, is whether Washington's con-viction was a reasonably foreseeable result of Wilmore's initial act of fabrication—the police report. *See Monroe v. Pape*, 365 U.S. 167, 187 (1961) (recognizing applicability to § 1983 claims of the rule of tort liability "that makes a man responsible for the natural conse-quences of his actions"), *overruled on other grounds*, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 695-701 (1978); *Jones v. City of Chi-cago*, 856 F.2d 985, 994 (7th Cir. 1988) ("[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading informa-tion that influenced the decision.").

It appears that little or no discovery has been conducted on the question of causation. *See Washington I*, 322 F. Supp. 2d at 698 (observing, in response to Washington's statement that he had not had an opportunity to take depositions, that "[t]he court has given Plaintiff ample time to conduct discovery in the sixteen months since this case has been filed"; directing Washington to conduct discovery "on the limited issue of whether officers Wilmore, Hart, Zeets and Schrum had actual knowledge of Washington's innocence at the time of Washington's interrogation"). In particular, Washington has not deposed the attorney who prosecuted the case, so we do not know whether Wilmore's false statement in the police report influenced the decision to bring charges against Washington and the manner in which the prosecution was conducted. We do know, however, that in his opening statement the prosecutor told jurors that Washington "told [Wilmore and Hart] a number of different things that could only have been known by somebody who actually had committed the offense." J.A. 468. And, we know that Washington's seemingly independent knowledge of details of the crime has been important throughout the history of this case. *See Washington v. Murray*, 4 F.3d 1285, 1292 (4th Cir. 1993) (concluding that Washington was not prejudiced by

trial counsel's ineffectiveness because "Washington had supplied without prompting details of the crime that were corroborated by evidence taken from the scene and by the observations of those investigating the Williams' apartment"); J.A. 526 (order of Lawrence Douglas Wilder, Governor of Virginia, granting a conditional pardon) (stating that even with newly discovered DNA evidence, "a review of the trial evidence, including the confessions of Earl Washington, Jr. reveals that he had knowledge of evidence relating to the crime which it can be argued only the perpetrator would have known").

In light of Wilmore's failure to challenge causation on appeal and the presently limited nature of the record, we think this is not a proper basis for reversal of the denial of qualified immunity by the district court. We therefore conclude that the facts stated by Washington allege the violation of his constitutional right not to be deprived of liberty as a result of the fabrication of evidence by an investigating officer. Moreover, this right was clearly established in 1983, when the events relevant to this litigation took place. *See Miller v. Pate*, 386 U.S. 1, 7 (1967) ("[T]he Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence."). Accordingly, we affirm the denial of qualified immunity.

## IV.

For the reasons set forth above, we affirm the judgment of the district court.

*AFFIRMED*

SHEDD, Circuit Judge, concurring:

I agree with the majority that the *Rooker-Feldman* doctrine does not bar our subject-matter jurisdiction in this case. I would add, however, that a district court, when presented with this issue, should consider it in the first instance. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999) ("Article III generally requires a federal court to satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case.").

I also agree that under our very limited standard of review, we must affirm the district court's denial of qualified immunity to Wilmore. As a result, on remand Washington's case against Wilmore will proceed on one very narrow claim: specifically, Washington's claim that Wilmore deliberately fabricated "evidence" by making the "unclear" statement in the May 24, 1983, police report that Washington "gave pertinent information about the crime [*i.e.*, the shirt] that no one knew with the exception of himself."[1] This claim, although extremely serious, is but one of many extraordinary allegations on which Washington premised this case, virtually all of which have been rejected (subject to future appellate review) as factually unsupported by the district court.

For example, in his Amended Complaint, Washington stated that his "ordeal was not a tragic mistake, but the result of a concerted effort by law enforcement officers . . . to convict him for [the Williams rape and murder] despite the total absence of credible evidence against him." Washington asserted that among their alleged misdeeds, these officers, who "knew or should have known" that he was innocent of the Williams rape and murder, used coercive tactics and "secured false and fabricated confessions from him, feeding him sufficient details about the crime until he 'got it right.'" Moreover, Washington asserted that although the officers "knew the confessions were bogus, they nevertheless arrested, charged, and tried [him] for capital murder, all the while suppressing or ignoring exculpatory evidence, concealing exculpatory evidence from him, failing to explore other obvious leads, and deliberately choosing not to test forensic evidence that would have exonerated him." Washington also asserted that he is mentally retarded and that the officers "knew or should have known that [he] was cognitively impaired and highly susceptible to police coercion."

Contrary to these allegations, the district court found that "[t]here is no evidence on the record tending to show that [the officers] knew that Washington was actually innocent of the Williams murder when

---

[1]*See Washington v. Buraker*, 322 F. Supp.2d 702, 717 (W.D. Va. 2004) ("The only remaining claims in this action are Washington's fabrication claim against Wilmore and Washington's state law defamation claim against defendant Gary L. Close").

he was interrogated following his arrest on May 21, 1983." *Washington*, 322 F. Supp.2d at 708. The district court similarly found that "[t]here is no evidence that the officers intentionally took advantage of Washington's mental state at the time of the interrogation to solicit a false confession," *id.*, or that they "knew that Washington was mentally retarded at the time of the interrogations," *id.* at 713. The district court also found that "[e]ven assuming that [the officers] asked Washington leading questions, the record supports the conclusion that Washington answered those questions, and confessed to the Williams murder;" the district court thus concluded that "[t]he confession itself was not a fabrication." *Id.* at 712. Consequently, the district court held that "there is no evidence on the record to support Washington's coercion claim against [the officers]." *Id.* at 715.

The First Circuit has aptly stated that "if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit. Actions taken in contravention of this prohibition necessarily violate due process (indeed, we are unsure what due process entails if not protection against deliberate framing under color of official sanction)." *Limone v. Condon*, 372 F.3d 39, 44-45 (1st Cir. 2004) (citation omitted).[2] By our decision today, we have expressed no opinion on whether any law enforcement officer — including Wilmore — violated this constitutional precept in regard to the criminal case against Washington.[3] We have merely held, based on the record before us and in light of our limited standard of review, that we cannot reverse the district court's denial of qualified immunity to Wilmore.

---

[2]Unquestionably, the circumstances of Washington's conviction and eventual pardon are extraordinary and warrant public scrutiny. *See Virginia Dept. of State Police v. Washington Post*, 386 F.3d 567, 574 (4th Cir. 2004), *cert. denied*, 2005 Westlaw 218466 (U.S. Mar. 28, 2005) (noting the public's obvious interest in how the justice system operated in the criminal case against Washington). However, the issue in this litigation is not simply whether the justice system failed Washington, but instead whether any such failure is the result of deliberate or reckless misconduct by law enforcement.

[3]Likewise, we have expressed no opinion whether the district court correctly dismissed Washington's other claims, which are not now before us.