WILLIAMS, Circuit Judge:
This case stems from the 2004 trial of Terry Nichols for the bombing of the Alfred P. Murrah Federal Building in Oklahoma City. Prior to the start of that trial, two Virginia police officers obtained and executed a search warrant at the home of John Culbertson, seizing computers and files belonging to Culbertson and *302 his employer, the Arkansas Chronicle. The target of the search warrant was a video and still photographs of the bombing that were last seen in electronic format. Culbertson and the Arkansas Chronicle filed this 42 U.S.C.A. § 1983 (West 2003) suit against Robert Murphy and Steve Milefsky, the two police officers who executed the search, claiming violations of their constitutional rights. Officers Milefsky and Murphy moved for summary judgment on the grounds of qualified immunity, which motion the district court denied. Officers Milefsky and Murphy now appeal. While the underlying facts of this case are unique, the legal principles guiding our decision are well established and lead to a result opposite of that reached by the district court. For the following reasons, we reverse the district court’s denial of qualified immunity to Officers Milefsky and Murphy.
I.
In 2004, prior to the start of Nichols’s trial in Oklahoma state court, one of Nichols’s attorneys spoke with attorney Thomas W. Mills of Dallas, Texas. Based on this conversation, Nichols’s defense attorney filed an “Ex Parte Sealed Emergency Motion for Order to Preserve Evidence and for Subpoena Duces Tecum” with the Oklahoma trial court. (J.A. at 193.) In the motion, Nichols’s defense attorney alleged that Mills informed him that in August 1998 Culbertson had shown him a video and still photographs on Culbertson’s laptop computer depicting the Murrah Building right before and after the bombing and that the images showed a Ryder truck.[1] The motion further alleged that Culbertson had shown Mills the video and photographs in the congressional offices of Congressman James Trafieant (D-Ohio). At that time, Culbertson was serving as a legislative aide to Trafieant. Nichols’s motion also cited Culbertson’s testimony before a House subcommittee, in which Culbertson stated that he had a video of a law enforcement officer describing the video images and photographs the officer had seen of the Oklahoma City bombing. Nichols’s defense team believed that these photographs could be crucial to Nichols’s defense. After receiving Nichols’s motion, the Oklahoma trial court held an in camera hearing and indicated that “if you came to me with this information and asked me as a judge to issue a search warrant, I probably would do it.” (J.A. at 256.) After the hearing, the Oklahoma City prosecutor began the process of obtaining a search warrant in Virginia where Culbertson resided.
To confirm the statements made by Nichols’s defense attorneys, on January 28, 2004, Oklahoma City Detective Mark Easley traveled to Dallas and spoke with attorney Mills. Mills confirmed to Detective Easley that Culbertson had shown him, on Culbertson’s laptop computer at Congressman Traficant’s office, a video of the Murrah Building “that was taken within minutes of when the bomb went off.” (J.A. at 55.) Mills said that the first frame showed the building, the next frame showed a glow at the bottom, the next frame showed the glowing ball going up the building, and the final frame showed the building collapsed. Mills also said that Culbertson told him that an Acohol, Tobacco and Firearms (ATF) agent had given him the video. Mills further said that Culbertson refused to go to the ATF or the FBI with the video tape because Culbertson needed to protect his source and the FBI did not want the video disclosed. During Detective Easley’s conversation with Mills, Mills informed Detective Eas *303 ley that he had spoken with Culbertson after Nichols’s “defense attorneys had learned about his ‘secret’ video and pictures.” (J.A. at 68.) In response to Mills’s comments, Culbertson told Mills that it was going to be a “tight rope for me to walk.” (J.A. at 68.)
Having received confirmation from Mills about the existence of the images, on January 30, 2004, Detective Easley traveled to Fairfax County, Virginia to speak with Culbertson. From the Fairfax County Police Department, Detective Easley placed a phone call to Culbertson. The phone call was tape recorded. Easley asked Culbertson if the images and video were still available and Culbertson responded
Well, I’m going to tell you the same thing I told Nichols’s attorneys. Because of a variety of complex legal issues, there is some journalistic law involved, there is legislative privilege involved with respect to the Congress and so forth. I’m just not at liberty to divulge whether it exists, where it’s at, whatever, until I’ve got guidance from appropriate counsel.
(J.A. at 97.) Culbertson informed Easley that he had worked for the Washington Bureau of the Arkansas Chronicle, a publishing entity since 1996, and that he maintained a home office. Easley further pressed Culbertson for information on the images, and Culbertson stated, “Well, what I can tell you is the stuff was turned over, you know, there’s public stuff on it that was turned over to the House Judiciary [Committee]. And that might be the place to look, uh, for these things.” (J.A. at 97.) Culbertson also informed Easley that he testified before the House Judiciary Contract Law Subcommittee on matters related to the Oklahoma City bombing in either 1999 or 2000. The House report confirms that Culbertson testified that “photos and video of the explosions at the Murrah Building” do exist and that Culbertson submitted images along with his report in 2000. See Fair Justice Act of 2000: Hearing on H.R. U105 Before the Subcomm. on Commercial and Admin. Law of the H. Comm, on the Judiciary, 106 Cong. 60-61 (2000) (statement of John Culbertson, Director, Center for Reform). Culbertson also denied to Detective Easley that he had seen a video showing a Ryder truck at the Murrah Building, and he then said that the video he submitted to the House subcommittee was the Sheriffs Department video “that you guys probably already have.” (J.A. at 101.) Culbertson next informed Easley that he no longer had the computer on which he showed Mills the video. Culbertson ended the conversation by telling Detective Easley that after he had spoken with his attorney, he would call Easley. Less than an hour later, Culbertson called Detective Easley and told him that he could not speak with him because of journalistic privilege stemming from his production of the show African Lifestyles, legislative privilege because he formerly worked for a congressman, and a third privilege relating to his position as a “consultant to the Philippines.” (J.A. at 104.)
Based on the information received from Mills and Culbertson’s refusal voluntarily to disclose his knowledge of the status of the video, Detective Easley sought a search warrant from a Fairfax County Circuit Court. The search warrant stated that Easley wanted to search Culbertson’s house to seize
any and all computer equipment, hard disk drives, compact disks, floppy disks, magnetic tapes or other magnetic or optical media capable of storing information in an electronic, magnetic, or optical format. This information may include, but it is not limited to letters, correspondence, memoranda, journals, electronic mail, image files, database files, deleted *304 files, partial files or other types of files found in the media or computer.
(J.A. at 65.) Detective Easley also filed a detailed affidavit setting forth the relevant facts in support of the search warrant and explaining that the officers were looking for a video and still images of the Oklahoma bombing. Detective Easley’s supporting affidavit described his conversations with attorney Mills and Culbertson. Detective Easley’s affidavit noted that Mills confirmed that he had seen images of the bombing, but that Mills could not recall whether he saw a Ryder truck depicted in the images and correspondingly that he did not tell Nichols’s attorney that he had seen a Ryder truck. Detective Easley also stated that in his experience “as a law enforcement investigator ... a person in possession of items of this magnitude and uniqueness is unlikely to dispose of or destroy the information. Instead, he is more likely to leave it on the computer or copy it to a disc of some sort or both.” (J.A. at 69.) A Fairfax County magistrate judge signed the search warrant and Fair-fax County police officers Murphy and Milefsky executed the search at Culbertson’s house. On January 30, 2004, Officers Murphy and Milefsky seized the following items from Culbertson’s home: eight desktop computers, two laptops, 454 diskettes, 170 CD-ROMS, 8 mini CD-ROMS, four zip disks, one hard drive, fourteen VHS tapes, four notebook binders, and one manilla folder containing documents. Officers Murphy and Milefsky then shipped the seized items to the Oklahoma City Police Department. Upon receipt of the boxes, the Oklahoma City police department withheld opening the boxes or examining the contents until it received judicial instructions. Ultimately, the alleged video and still photographs were not found.
Culbertson and the Arkansas Chronicle then filed this suit in federal court against Officers Milefsky and Murphy alleging constitutional violations pursuant to § 1983. Officers Milefsky and Murphy moved for summary judgment on the basis of qualified immunity. The district court denied qualified immunity finding that Culbertson’s Fourth Amendment rights were violated and that Officers Milefsky and Murphy should have known that the search warrant was unconstitutionally overbroad and lacking in probable cause. Officers Milefsky and Murphy timely filed an interlocutory appeal. We have jurisdiction over their legal challenge to the district court’s denial of their motion for summary judgment under 28 U.S.C.A. § 1291 (West 1993). Washington v. Wilmore, 407 F.3d 274, 281 (4th Cir.2005). “To the extent that the denial of qualified immunity rests on a question of law, the decision is final pursuant to the collateral order doctrine” and subject to de novo review. Id.
II.
“Qualified immunity shields government officials from civil liability ‘insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.’ ” Trulock v. Freeh, 275 F.3d 391, 399 (4th Cir.2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). “In considering an appeal from the rejection of a qualified immunity defense, our first task is to determine whether a constitutional right would have been violated on the facts alleged.” Wilmore, 407 F.3d at 281. If no rights have been violated, then the inquiry ends. If a violation has occurred, then the court must determine whether the right violated was clearly established at the time of the violation, here the search and seizure, and “[o]nly where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable,” Malley v. Briggs, *305 475 U.S. 335, 344-45, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (internal citation omitted), or where the overbreadth of the search warrant is apparent to a reasonable police officer, Anderson v. Creighton, 483 U.S. 635, 640-41, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), will we deny qualified immunity.
The district court denied Officers Milefsky and Murphy qualified immunity, concluding that the search warrant was over-broad and lacked probable cause and that it would have been unreasonable for Murphy and Milefsky to believe that the search warrant was not overbroad or was supported by probable cause. We will address each of the district court’s conclusions in turn.
A. Overbreadth
The “[F]ourth [Ajmendment prohibits general warrants and general searches.” United States v. Fawole, 785 F.2d 1141, 1144 (4th Cir.1986). To prevent a general rummaging through a person’s personal belongings, a search warrant should remove “from the officer executing the warrant all discretion as to what is to be seized.” United States v. Torch, 609 F.2d 1088, 1089 (4th Cir.1979). Nevertheless, the specificity required for a warrant “varies with the circumstances within a practical margin of flexibility.” United States v. Shilling, 826 F.2d 1365, 1369 (4th Cir.1987), abrogated on other grounds by Staples v. United States, 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994). For example, in a search warrant for business records, it is acceptable for the warrant to use generic terms (“such as books, records, bank statements, etc.”) without detailed descriptions because the Government is unlikely to know in detail how the records are maintained. Id.
Culbertson and the Arkansas Chronicle argue that a heightened standard of particularity is required in this case because the items seized were protected by the First Amendment and “the particularity requirement is even more stringent where the things to be seized have the presumptive protection of the First Amendment.” Torch, 609 F.2d at 1089. To be sure, “the constitutional requirement that warrants must particularly describe the ‘things to be seized’ is to be accorded the most scrupulous exactitude when the ‘things’ are books, and the basis for their seizure is the ideas which they contain.” Stanford v. Texas, 379 U.S. 476, 485, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965); see also New York v. P.J. Video, Inc., 475 U.S. 868, 873, 106 S.Ct. 1610, 89 L.Ed.2d 871 (1986)(noting that “the seizure of films or books on the basis of their content implicates First Amendment concerns not raised by other kinds of seizures” (emphasis added)). Although Culbertson was employed part-time by a news media organization and some of the items seized by the officers belonged to the Arkansas Chronicle, we agree with the district court that the heightened specificity standard for items protected by the First Amendment does not apply in this case.
Here, the basis of the seizure was an attempt to shed evidentiary light on one of the most heinous crimes in this country’s history, not to suppress the ideas contained in the documents. See Stanford, 379 U.S. at 485, 85 S.Ct. 506 n. 16 (noting that had the Communist books at issue been ledgers of illegal activity or stolen goods, such books “might stand on a quite different constitutional footing from the [Communist] books” sought in the case). The search warrant here was incidental to any alleged First Amendment activity and was not used as “an instrument for stifling liberty of expression,” which is the evil that the heightened particularity standard is designed to combat. Zurcher v. Stan *306 ford Daily, 436 U.S. 547, 564, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978). Thus, because “[t]he items named in this warrant were evidentiary materials, and their seizure did not threaten to deprive the public of access to protected material,” we decline to apply any heightened specificity.[2] Torch, 609 F.2d at 1090 (internal quotation marks omitted).
Having rejected the application of the heightened specificity standard, we now turn to the merits of the overbreadth argument, applying a standard that recognizes that the necessary particularity for a search warrant varies “according to the circumstances and type of items involved.” Id. Also, built into this standard is “a practical margin of flexibility.” Id. The district court’s conclusion that the search warrant was limitless because it authorized Officers Milefsky and Murphy to seize “every piece of computer equipment and every type of document that might be stored on such equipment,” (J.A. at 385), failed to equate the circumstances of the targeted items with the language of the search warrant. Because the video and photographs were already in electronic form, they could be transferred to numerous other electronic devices and put into countless types of formats. See United States v. Reyes, 798 F.2d 380, 383 (10th Cir.1986) (holding that “in the age of modern technology and commercial availability of various forms of items, a [search] warrant could not be expected to describe with exactitude the precise form the records would take”). We cannot and should not tie the hands of law enforcement by expecting an investigative officer to know the exact format electronically stored evidence will take. Notably, the district court did not suggest a method for narrowing or describing with increased specificity the items to be seized, and we also cannot discern a more precise way to describe items stored in electronic format. Culbertson and the Arkansas Chronicle, however, suggest that the search warrant could have limited the electronic items to be seized by specifying that only “image” files such as .jpg, .tip, .bmp, or .gif files could be searched. (Appellee’s Br. at 24.) Although we recognize that image files are usually stored and labeled as such, this proposal ignores the fact that a warrant that authorized the seizure of any device “capable of storing” .jpg, .tip, .bmp, or .gif files would still authorize officers to seize “computer equipment, hard disk drives, compact disks, floppy disks, magnetic tapes or other magnetic or optical media” to allow the officers to search for the .gif, .tip, .bmp, or .jpg files. Furthermore, it is possible to embed an electronic image into a word processing file or convert the image into .pdf format and still have the document labeled as a .wpd, .doc, or .pdf file, as opposed to .jpg, .gif, .tif, or .bmp. Therefore, because the search warrant and supporting affidavit described with sufficient particularity the items to be seized “within a practical margin of flexibility,” we must reject Culbertson’s argument that the *307 search warrant was a general warrant. Shilling, 826 F.2d at 1369.
Next, we turn to the district court’s conclusion that the search warrant was overbroad because the warrant sought images that were last seen electronically, while the warrant allowed for the seizure of “letters, correspondence, memoranda, [and] journals.” (J.A. at 385.) The district court concluded that “a search warrant that allowed the police to seize letters, correspondence, memoranda, and journals in order to find a video and three still photographs is patently overbroad.” (J.A. at 386.) Culbertson and the Arkansas Chronicle argue that the search warrant only provided for the seizure of electronic forms of letters, correspondence, journals, and memoranda, and thus the seizure of hard copies of such items was outside the scope of the search warrant. The search warrant references information stored in “electronic, magnetic, or optical format” and then further states that “this information may include ... letters, correspondence, memoranda [and] journals.” (J.A. at 65 (emphasis added).) We agree that the most natural, close reading of the search warrant is that only electronic, magnetic, or optical forms of “letters, correspondence, memoranda [and] journals” could be searched. Thus, the search warrant cannot be overbroad for this reason.[3]
Finally, the district court concluded that the search warrant was overly broad because it allowed for the seizure of Culbertson’s son’s computer. The seizure of the son’s computer does not render the search warrant overly broad because the images could have been stored on any computer within Culbertson’s home to which he presumably had access, including his son’s computer. Also, parents frequently pass down to their children their old computers, and because the officers were searching for old images, it would have been reasonable to search the son’s computer. Moreover, to hold search warrants that allow for the search of a parent’s belongings as necessarily overbroad because they also allow for the search of the belongings of a child residing with a parent would prove unworkable for investigating officers. For example, if police were searching for a stolen handgun or drugs, and the search warrant allowed for the search of the parent’s home, it is unlikely that we would not allow the police to search a minor child’s room within the parent’s home. See United States v. DiPrima, 472 F.2d 550, 551 (1st Cir.1973) (“[E]ven if a minor child, living in the bosom of a family, may think of a room as ‘his,’ the overall dominance will be in his parents.”). A rule barring the search of a minor child’s property that lies within a parent’s home simply would encourage a parent to hide contraband with his child.
The supporting affidavit, describing the alleged video and still images and the search warrant’s focus on electronic, magnetic or optical storage forms that could contain the images, “served to limit the discretion of the officers who conducted the search.” Torch, 609 F.2d at 1090. The area to be searched was confined to Culbertson’s home and the items to be seized were those capable of storing electronic, magnetic, or optical data. For these reasons, we conclude that this search warrant “falls within the practical margin of flexibility.” Id.
*308 B. Probable Cause
We now turn to the issue of probable cause. “Probable cause deals with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act.” Illinois v. Gates, 462 U.S. 213, 241, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (internal quotation marks omitted). “The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the ‘veracity and ‘basis of knowledge’ of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.” Id. at 238, 103 S.Ct. 2317. “Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according great deference to a magistrate’s determination.” United States v. Leon, 468 U.S. 897, 914, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (internal quotation marks omitted). However, “reviewing courts will not defer to a warrant based on an affidavit that does not provide the magistrate with a substantial basis for determining the existence of probable cause.” Id. at 915, 104 S.Ct. 3405.
The affidavit given to the magistrate provided the following pertinent statements: (1) Detective Easley, the affiant, had been an Oklahoma police officer for twelve years and had been investigating the Oklahoma City bombing for five years; (2) in 1998, Culbertson showed Mills a video and photographs of the Murrah Building before and after the bombing on a laptop computer; (3) Mills said he viewed images on Culbertson’s laptop; (4) Mills said that he could not recall whether the images shown by Culbertson contained a picture of a Ryder truck as Nichols’s defense attorney alleged; (5) Mills said an ATF agent gave Culbertson the video; (6) Culbertson told Mills that Nichols’s attorneys’ knowledge about the video and photographs was “going to be a tight rope for [him] to walk”; (7) Culbertson admitted to Detective Easley that he had shown Mills a video and photographs; (8) Culbertson stated that the video and photographs were provided to the House Judiciary Committee several years ago; (9) Culbertson refused to say whether he still had copies of the video and photographs; and (10) Detective Easley’s professional opinion that an individual in possession of “items of such magnitude and uniqueness [would be] unlikely to dispose of or destroy the information.” (J.A. at 67-69.) The affidavit omitted the following facts known to Detective Easley: (1) Culbertson said he had shown Mills the video on a government computer; (2) Culbertson was employed by former Congressman James Traficant at the time he showed the video to Mills; and (3) Culbertson testified before the House subcommittee in 2000 and submitted a tape along with his testimony.
Although Culbertson’s submission of images to the House subcommittee and the fact that Mills viewed the images on a government computer could support an inference that Culbertson no longer had the video and photographs, the remaining facts are sufficient to demonstrate a fair probability that Culbertson still possessed the video and photographs or copies thereof. Namely, Culbertson’s admission to Detective Easley that he had shown Mills a video of the bombing and Culbertson’s statement that he would have to walk a “tight rope” because of the video and photographs are strong evidence that Culbertson still possessed the video or a copy thereof. As his congressional testimony indicates, Culbertson still had the video *309 two years after showing it to Mills and at that point he was no longer working for the government, further suggesting that Culbertson valued the video and would have maintained copies of it. Also, Culbertson’s evasive statement that journalistic and other irrelevant privileges prevented him from divulging to Detective Easley whether or not he held a copy of the video provides additional support for probable cause.[4] And finally, we find particularly astute Detective Easley’s statement that an individual with possession of such a highly sought after video is likely to maintain possession of it; Culbertson was a journalist, and such information is the bread and butter of his work. A cumulative reading of the affidavit suggests that Culbertson did have a copy of the video and images, even if he had already turned over a copy of some video to the House subcommittee.[5] It is then a short, logical step to surmise that Culbertson would have a copy of the video and images at his house or at his home office. This is a logical inference due, in part, to the nature of electronic, magnetic, and optical items because, as discussed in subsection A, such materials can be copied and stored, the video and images could easily be stored in multiple locations, including Culbertson’s home. See United States v. Anderson, 851 F.2d 727, 729 (4th Cir.1988) (adopting the view that “the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence”). We recognize that some of the individual facts alleged in the affidavit may be read to support other inferential ends, see infra dissent at pages 33-35, but we believe that the affidavit provides a substantial basis for the magistrate’s determination that Culbertson retained possession of the vid-' eo and images and that they would likely be found at his home. See Gates, 462 U.S. at 240, 103 S.Ct. 2317 (noting that a magistrate can “draw such reasonable inferences as he will from the material supplied to him by applicants for a warrant”).
Having concluded that the facts alleged in the affidavit support a finding of probable cause, we address Culbertson’s and the Arkansas Chronicle’s contentions that those facts were stale. “A valid search warrant may issue only upon allegations of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time. Whether the proof meets this test must be determined by the circumstances of each case.” United States v. McCall, 740 F.2d 1331, 1335-36 (4th Cir.1984) (internal quotation marks omitted). At the outset, we note that “[t]he validity of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit,” United States v. Farmer, 370 F.3d 435, 439 (4th Cir.2004) (internal quotation marks omitted), and “[m]any courts *310 have found probable cause to exist despite substantial gaps between the observation of the evidence at a particular premises and the issuance of a search warrant,” McCall, 740 F.2d at 1336.
Stale search warrants arise in two situations: (1) the government waits an extended period of time between the information provided and the execution of the warrant and (2) “the information on which [the search warrant] rested was arguably too old to furnish ‘present’ probable cause.” Id. The district court found that this case fell into the latter category because Mills viewed the tape in the presence of Culbertson almost six years prior to the issuance of the search warrant.
Mills’s viewing of the video and three still images six years prior is but one piece of the puzzle. And the probable cause analysis requires that we examine the totality of the circumstances. See Farmer, 370 F.3d at 439 (“[W]e must look to all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized.” (internal quotation marks omitted)). Viewing all of the evidence set forth in the affidavit demonstrates that the search warrant was not stale. Except for Mills’s undisputed viewing of the video in 1998, all other evidence contained in the affidavit was obtained in close proximity to the issuance of the search warrant. For example, on January 28, 2004, a mere two days before the search, Mills told Detective Easley that Culbertson told him that he was having to walk a “tight rope” with Nichols’s defense attorneys. Also, Culbertson’s own statements to Detective Easley, confirming that he had shown Mills a video and photographs, occurred within twenty-four hours of the issuance and execution of the search warrant. And Detective Easley’s observation that no one would discard such evidence was timely and credible. See McCall, 740 F.2d at 1336 (“In some circumstances, the very nature of the evidence sought may suggest that probable cause is not diminished solely by the passage of time.”).
Culbertson and the Arkansas Chronicle further argue that, because no “continuing crime” was involved, the lack of temporal proximity between Mills’s viewing of the video in 1998 and the issuance of the search warrant renders the search warrant stale. As previously discussed, the viewing of the video by Mills was but one supporting piece of the puzzle and, contrary to Culbertson and the Arkansas Chronicle’s suggestion, the presence of a “continuing crime” is not a requirement for justifying a search warrant when a period of years lapses between one of the factual predicates and the issuance of the search warrant. See Id. at 1337 (finding search warrant not stale even though “the criminal activity alleged in the warrant is not ongoing in nature, nor the evidence sought intrinsically likely to remain at the location where it was originally observed”). In addition, the alleged video related to a report that Culbertson authored and to his testimony before the House subcommittee in July 2000-two years after Culbertson showed Mills the video. Thus, as part of Culbertson’s lengthy research into the Oklahoma City bombing, it is likely that Culbertson would have kept copies of all relevant material supporting such a substantial report. To accept Culbertson’s argument, we would have to assume that Culbertson, after intensely researching the Oklahoma City bombing and compiling extensive documentation, including video footage of the bombing, would have relinquished all copies of all documentation to another person or simply destroyed all such information. In light of Culbertson’s statements to Detective Easley and his position as a journalist, we find this is *311 highly unlikely. Finally, a secret video of a historic event is likely to be very valuable. See, e.g., Film of JFK killing valued at $16 million, CNN.com, Aug. 3, 1999 http://www.cnn.com/US/9908/03/zapruder.02/ (noting that Abraham Zapruder’s film of the Kennedy assassination was valued at $16 million). Having examined all the relevant evidence set forth in the affidavit, along with the nature of the evidence sought, we conclude that the search warrant was not based on stale information.
C. Reasonable Officer’s View of the Search Warrant
We now return to the issue of whether the seizure of items outside of the search warrant violated Culbertson’s and the Arkansas Chronicle’s constitutional rights. At the outset we readily acknowledge that “[i]f the scope of the search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more.” Horton v. California, 496 U.S. 128, 140, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). However, even when a constitutional violation is found, qualified immunity may still attach if a reasonable officer would not have realized that he was exceeding the scope of the search warrant. Saucier v. Katz, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). This inquiry “must be undertaken in light of the specific context of the case, not as a broad general proposition.” Id. at 201, 121 S.Ct. 2151. To put it more concisely “the unlawfulness must be apparent.” Anderson, 483 U.S. at 640-41, 107 S.Ct. 3034.
We begin our analysis by noting that the search warrant clearly authorized the seizure of items in “electronic, magnetic, or optical format.” Our conclusion that the search warrant did not authorize the seizure of paper forms of “letters, correspondence, memoranda, [and] journals” came only after carefully examining the sentence structure of the search warrant. We believe it would not have been unreasonable for a police officer to interpret the words “letters, correspondence, memoranda, [and] journals” as allowing for the seizure of paper copies of these items-one typically thinks of these items in their physical format, as opposed to their electronic, magnetic, or optical format. See Mazuz v. Maryland, 442 F.3d 217, 225 (4th Cir.2006) (“In order to satisfy the reasonableness requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government is not that they always be correct, but that they always be reasonable.” (internal quotation marks and alterations omitted)). For example, the word “letter” is often used to describe the physical paper used for communication, whereas, the word “email” is most often associated with electronic communication that remains in electronic form. We further recognize that Officers Milefsky and Murphy knew by way of the attached affidavit that they were searching for a video and still photographs and common sense stands to reason that electronically stored images, such as the still photographs, could be printed out and stored in physical form amongst “letters, correspondence, memoranda, [and] journals.” It is also worth noting that the four notebook binders and one manilla envelope contained information related to Culbertson’s research on the Oklahoma City bombing. This information coupled with the common perception that “letters, correspondence, memoranda, and journals” typically reference hard copies may not have placed a reasonable officer on notice that the seizure of the notebooks and manilla folder was outside the scope of the search war *312 rant and possibly violated constitutional rights. Moreover, the fact that the four notebooks and one folder were the only items seized outside of the scope of the search warrant also suggests that the mistake was a reasonable one. We, therefore, cannot say that the unlawfulness of the seizure of the notebooks and folder was apparent. Officers Milefsky and Murphy are entitled to qualified immunity.
III.
In summary, we conclude that the search warrant properly described with sufficient particularity the items to be seized, that probable cause existed to support the issuance of the search warrant, and that qualified immunity shields Officers Milefsky and Murphy from any constitutional violations resulting from the seizure of the notebooks and manilla folder. Accordingly, the district court’s order is REVERSED.

. A Ryder track is believed to have carried the bomb to the Murrah Building.

. We note, however, that even if the heightened standard applied, we wotdd reach the same result. The Supreme Court has held that the "particular exactitude” requirement is satisfied when it leaves "as little as possible to the discretion or whim of the officer in the field.” Zurcher v. Stanford Daily, 436 U.S. 547, 564, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978). For the reasons set forth in this section, infra, the search warrant left little to no discretion to the executing officers. For example, Officers Milefsky and Murphy did not have to determine anything as difficult as whether the electronic material they seized was “obscene” or related to Communist thoughts, as other search warrants held to be invalid have required. See id. Officers Milefsky and Murphy only had to determine whether an item could store electronic, magnetic, or optical data. Thus, the search warrant described with "particular exactitude” the things to be seized.

. The conclusion that the search warrant did not explicitly allow for the seizure of hard documents, such as the four notebooks and one manilla folder, forces us to address whether the seizure of these items outside of the search warrant violated the Fourth Amendment rights of Culbertson and the Arkansas Chronicle. We will return to this point in section C in the text infra.

. As pointed out by our good dissenting colleague, the mere refusal to cooperate cannot alone support a finding of probable cause, however, the refusal to cooperate may be considered along with other supporting facts in evaluating a search warrant for probable cause. See Florida v. Bostick, 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (noting that a "refusal to cooperate, without more, does not furnish the minimal level of objective justification for a detention or seizure” (emphasis added)).

. It is unclear from the record whether the video allegedly submitted to the House subcommittee is, in fact, the video Detective Easley was seeking. This is particularly important because Culbertson told Detective Easley that anything public he turned over to the House subcommittee. Detective Easley was not looking for "public” information, but for a secret, never publicly disclosed video of the bombing.